## LOUIS K. LIGGETT CO. ET AL. *v.* LEE, COMPTROLLER, ET AL.

No. 301.   Argued January 12, 13, 1933.—Decided March 13, 1933.

Mr. *Thomas B. Adams* for appellants.

520

*Mr. Roy M. Sterne* filed a separate brief on behalf of Louis K. Liggett Co., appellant.

522

524

*Mr. W. H. Dannat Pell* filed a separate brief on behalf of J. C. Penney Co., appellant.

526

*Mr. H. E. Carter,* Assistant Attorney General of Florida, with whom *Mr. Cary D. Landis,* Attorney General, was on the brief, for appellees.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

Chapter 15624 of the laws of Florida, 1931, declares it unlawful for any person, firm, corporation, association, or copartnership, foreign or domestic, to operate any store within the State without first having obtained a license, designates the officer to whom application shall be made, regulates the procedure for issuance of licenses, and provides for annual renewal. The act requires the payment of a filing fee, and by § 5, which is copied in the margin,*

---

* " Section 5. Every person, firm, corporation, association or copartnership opening, establishing, operating or maintaining one or more stores or mercantile establishments within this State, under the

fixes the amount of the license fee. A tax greater than that exacted for a single store is fixed for each store in excess of one, but not exceeding fifteen, owned or operated by the same person or corporation. The fee for each store is stepped up in amount as the number constituting the chain reaches certain specified limits. This graduated scale applies to stores all of which are within a single county; but if the same number of stores is located in more than one county the license fee for each is materially increased.

The act imposes the tax only on retail stores and excludes from the definition of a store filling stations engaged exclusively in the sale of gasoline and other petroleum products. It provides for a separate county license tax equal to twenty-five per cent. of the state license fee, and authorizes a municipal tax of the same amount, measuring the graduated tax in the case of counties and municipalities by the number of stores situate

---

same general management, supervision or ownership, shall pay the license fee hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments. The license fee herein prescribed shall be paid annually, and shall be in addition to the filing fee prescribed in Sections 2 and 4 of this Act.

"The license fees herein prescribed shall be as follows:

"(1) Upon one store, the annual license fee shall be Five Dollars for each such store.

"(2) Upon two stores or more, but not exceeding fifteen stores, where the same are located in any one county, the annual license fee shall be Ten Dollars for each such additional store.

"(3) Upon two stores or more, but not to exceed fifteen stores, where the same are located in different counties, the annual license fee shall be Fifteen Dollars for each such additional store.

"(4) Upon each store in excess of fifteen, but not to exceed thirty, when all are located in any one county, the annual license fee shall be Fifteen Dollars for each such additional store.

"(5) Upon each store in excess of fifteen, but not to exceed thirty, where the same are located in different counties, the annual license fee shall be Twenty Dollars for each such additional store.

in the county or municipality, notwithstanding the applicant may own other stores beyond the limits of the governmental subdivision.

In addition to the described license taxes the act imposes a levy of $3.00 for each $1,000 of value of stock carried in each store, or for sale in such store, and this is defined to include merchandise owned by the taxpayer and held in storage to be sold in or through such store.

Three chain store owners filed in the Circuit Court of Leon County, Florida, a class bill, in which twelve others intervened and became co-plaintiffs, praying that the tax officials be enjoined from enforcing the act. The complainants are corporations of Florida and other states. They challenge the statute as violative of various provisions of the constitution of Florida, of the due process and equal protection clauses of the Fourteenth Amendment, and of the commerce clause of the Federal Constitution.

---

"(6) Upon each store in excess of thirty, but not to exceed fifty, where all are located in any one county, the annual license fee shall be Twenty Dollars for each such additional store.

"(7) Upon each store in excess of thirty, but not to exceed fifty, where the same are located in different counties, the annual license fee shall be Thirty Dollars for each such additional store.

"(8) Upon each store in excess of fifty, but not to exceed seventy-five stores, where all are located in any one county, the annual license fee shall be Thirty Dollars for each such additional store.

"(9) Upon each store in excess of fifty, but not to exceed seventy-five, where the same are located in different counties, the annual license fee shall be Forty Dollars for each such additional store.

"(10) Upon each store in excess of seventy-five, where all are located in any one county, the annual license fee shall be Forty Dollars for each such additional store.

"(11) Upon each store in excess of seventy-five, where the same are located in different counties, the annual license fee shall be Fifty Dollars for each such additional store.

" In addition to the above amounts, Three Dollars for each and every One Thousand Dollars of value of stock carried in each store or for sale in such store,"

The bill sets forth in great detail facts claimed to assimilate the operation of chain stores to that of stores individually owned and operated in the state of Florida. So-called voluntary chains of retail stores are described at length and their methods of operation compared with those of chain stores, the purpose being to demonstrate that there is no essential difference between the two methods of conducting business. On the basis of the facts recited the bill charges that to tax a store operated in the one manner and exempt an establishment conducted in the other is arbitrary and unreasonable. The difference in the amount of tax laid upon the operator of a given number of stores in a single county and another conducting the same number in two or more counties is challenged as an unconstitutional discrimination. The imposition of a tax of $3.00 per $1,000 on retail merchants not only as respects the stock actually contained in their stores, but also on goods in warehouse intended for sale in such stores, is attacked as discriminatory, for the reason that under another statute wholesale merchants are taxed only $1.50 per $1,000 of merchandise carried in their stores or warehouses. The exemption of filling stations is alleged to discriminate against the appellants in violation of the Fourteenth Amendment. The bill further avers that certain of the plaintiffs receive their goods from warehouses maintained outside the state of Florida, or order shipments to their stores from wholesale houses situate without the State, whereas many operators of single stores who are members of voluntary chains obtain their supplies from wholesalers in Florida, or from a warehouse in the State conducted by a voluntary chain corporation. The unequal effect of the act on these transactions is charged to be an unconstitutional burden upon interstate commerce. The defendants moved to dismiss. The cause was heard upon this motion and a decree entered dismissing the bill at complainants' costs. The Supreme Court of

Florida affirmed the decree. The present appeal presents only the questions arising under the Federal Constitution.

1. In support of the allegation of arbitrary and unreasonable discrimination the bill recites facts from which appellants claim the conclusion is inevitable that there is no difference between the method of conducting chain stores and those employed in department stores, so-called voluntary chains, and singly operated units. This is but a reiteration of the contention made and overruled in *State Board of Tax Commissioners* v. *Jackson*, 283 U. S. 527. It was there held that whatever may be said of individual similarities and differences between chain store operation and the conduct of a single shop or a department store, the former employ distinguishable methods of conducting business, and the legislature may make the difference in method and character of the business the basis of classification for taxation. In their bill the complainants aver that the fact situation in Florida at the date of suit differed materially from that set forth in the *Jackson* case. Each of the features of chain store operation enumerated in this court's opinion is singled out, and as respects each the averment is that as to some chain store operators, or some operators of individual stores, the present case differs from the *Jackson* case.

In their endeavor thus to distinguish the earlier case, the appellants stress mere details, but ignore the underlying reason for sustaining the classification there attacked. The decision in the *Jackson* case was based not upon any single feature of chain store management, but upon the ultimate fact of common knowledge, illustrated and emphasized by the evidence, that the conduct of a chain of stores constitutes a form and method of merchandising quite apart from that adapted to the practice of the ordinary individually operated small store or department store; and that the difference between an integrated and a voluntary chain is fundamental. While

incidents of the operation of the one may be quite similar to those found in the other, there is a clear distinction between one owner operating many stores and many owners each operating his own store with a greater or less measure of coöperation voluntarily undertaken. The legislature may make the distinction the occasion of classification for purposes of taxation. Neither similarity of opportunities and advantages in some aspects, nor the fact that the one kind of store competes with the other, is enough to condemn the discrimination in the taxes imposed. It is needless to repeat what was said in the *Jackson* case to the effect that the difference between the subjects taxed need not be great, and that if any reasonable distinction can be found the duty of the court is to sustain the classification embodied in the law.

2. The statute lays a tax of a stated sum per store on any given number of stores in the same ownership located within the same county; but if one happens to be in a county other than that in which the remainder are situate, imposes an increased tax not only on the single one lying in the second county, but on all. Thus if an owner has fourteen stores he may add a fifteenth in the same county and the only additional tax will be in the amount of $10 attributable to the privilege of conducting the new store. But if the new store happens to be in another county the license fee for it will be increased to $15, and that for each of the other fourteen, which have long since been opened and operated in the original county, will be increased from $10 to $15.

We are unable to discover any reasonable basis for this classification. As we have held, gradation of the tax according to the number of units operated cannot be said to be so unreasonable as to transcend the constitutional powers of the legislature. The addition of a store to an existing chain is a privilege, and an increase of the tax on all the stores for the privilege of expanding the chain can-

not be condemned as arbitrary; but an increase in the levy not only on a new store but on all the old stores, consequent upon the mere physical fact that the new one lies a few feet over a county line, finds no foundation in reason or in any fact of business experience. There is no more reason for adopting the county line as the measure of the tax than there would be for taking ward lines in cities, or arbitrary lines drawn through the state regardless of county boundaries. It is suggested that the license fee for extending operations into a great and populous city, or for doing business upon crowded business streets, should be greater than for the same privilege in a village or a sparsely settled suburb. But the adoption of a county line can have no reference either to density of population, congregation of the buying public, or any other factor bearing upon the choice of a business site.

The appellees suggest that an owner reaps greater advantage by the establishment of a new store in a county not previously occupied. This may be conceded. It is evident, however, that the mere spatial relation between the store and a county line, cannot, in and of itself, affect the value of the privilege enjoyed. The appellees fail to show how the fact that the new place of business lies in another county increases the advantage over that to accrue from a location within the same county. The classification is solely of different chains, and the difference between them consists neither in number, size, surrounding population, nor in any factor having a conceivable relation to the privilege enjoyed.

It cannot justifiably be said that the section draws a distinction between national and local chains. The operation of the statute forbids any such assumption; for if a national chain keeps multiple units within a single county the tax on each is at the lower rate, while if a so-called local chain has one store in a given county and another just over the county line both places of business

take the higher rate. This difference in treatment has no discernible relation to the sort of chain which establishes a store across a county line. The Act is not a rough and ready but honest effort to differentiate what the Federal Census Bureau for its purposes denominates local chains on the one hand and what the Bureau terms sectional or national chains on the other. Neither the phraseology nor the method of operation of the Act is consistent with an attempt at any such classification.

The suggestion is made that the statute is in reality aimed solely at large corporate chains; and that as none other are parties to this suit, we may ignore any discriminatory features as respects individual owners of multiple units. But this is to construe the act by pure speculation and not by what it says, nor by any declared purpose, nor by anything contained in the record. Conceding for the purpose of the argument that in levying the tax the legislature might have drawn a distinction between corporate owners and individuals, and again between small owners, whether corporate or individual, and large owners, we are not permitted to guess at any such undisclosed purpose in the minds of those who adopted the statute. Assuming power to suppress by taxation a form of organization deemed inimical to the public interest, we can attribute no such motive to the present statute in the absence of legislative declaration or record proof. The Act taxes ownership and operation of stores, not corporate nor large corporate operation. The exaction is based on the doing of a business, not on the personality of the merchant.

The title declares it "An act requiring licenses for the operation, maintenance, opening or establishment of stores in this State" . . . Section 1 enacts "That from and after the first day of October, A. D. 1931, it shall be unlawful for any person, firm, corporation, association or co-partnership, whether foreign or domestic, to operate,

maintain, open or establish any store in this State without first having obtained a license . . ."

It would violate every principle of statutory construction to hold that this plain language really means that individuals and small local corporations are not within the intendment of the Act, but that it in fact applies only to so-called giant corporations. To attribute such a covert, hidden, and indirect purpose to those who passed the statute is, in effect, to charge the lawmakers with saying one thing and meaning another. Nothing said in *O'Gorman & Young* v. *Hartford Fire Insurance Co.*, 282 U. S. 251, or any other decision of this court, justifies such a pronouncement. The legislature of Florida has declared the purpose and object of the statute to be to tax every store owner and operator, and we should not go behind that declaration and attribute to the lawmakers some other ulterior design. Corporations are as much entitled to the equal protection of the laws guaranteed by the Fourteenth Amendment as are natural persons. *Southern Ry. Co.* v. *Greene*, 216 U. S. 400; *Kentucky Finance Corp.* v. *Paramount Exchange*, 262 U. S. 544; *Power Mfg. Co.* v. *Saunders*, 274 U. S. 490; *Liggett Co.* v. *Baldridge*, 278 U. S. 105; *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239. Unequal treatment and arbitrary discrimination as between corporations and natural persons, or between different corporations, inconsistent with the declared object of the legislation, cannot be justified by the assumption that a different classification for a wholly different purpose might be valid.

Those provisions of § 5 which increase the tax if the owner's stores are located in more than one county are unreasonable and arbitrary, and violate the guaranties of the Fourteenth Amendment.

3. Section 11 of the act provides:

"A County license tax of twenty-five per cent of the State license tax shall be levied and imposed upon each

store as herein defined and each incorporated municipality of the State of Florida is authorized to levy a municipal license tax of twenty-five per cent of the State tax imposed by this Act, provided that the tax levied by or for the several counties and municipalities shall be graduated only on the number of stores situate in such county or municipality, respectively, notwithstanding the applicant may own other stores beyond the limits of such county or municipality, as the case may be. . . ."

The attack upon this section is the same as that leveled against § 5, which ordains the license tax for state purposes. If, as we have held, it is permissible for the state for its own purposes to impose a tax on a graduated scale depending upon the number of units operated by the chain, it is equally so for a municipality to grade its taxation by the same method, when duly authorized by state authority.

4. Section 5, in addition to the graduated license fee, lays a tax of $3.00 on each $1,000 value of stock carried in each store, or for sale in such store, and § 2 includes within the goods, wares and merchandise from which sales are to be made those owned by the taxpayer and held in storage to be sold in or through such store. The appellants insist that this requirement deprives them of the equal protection of the law for the reason that wholesale merchants not taxed by the act in question are assessed under § 926 of the Revised General Statutes of Florida a tax of only $1.50 per $1,000 of value on stock carried in their stores or warehouses. The result is said to be that a chain store operator must pay double the amount paid by the wholesaler who supplies individual stores competing with the chain.

Chain stores do not sell at wholesale. What they store, if they warehouse any goods in the state of Florida, is for the purpose of retail sale at their shops. On the other hand, goods held by a wholesaler are stored for sale to

retail establishments, to be resold by the latter. What has been said with respect to difference in methods and operation of the two kinds of warehouses applies in this instance. The diverse purposes of the storage and the difference in the nature of the business conducted are sufficient to justify a different classification of the two sorts of warehouses for taxation.

5. Section 8, which defines a store, contains a proviso to the effect that the term shall not include "filling stations engaged exclusively in the sale of gasoline or other petroleum products." The appellants assert the exemption deprives them of equal protection, since it is arbitrary and unreasonable. It appears, however, that all dealers in gasoline, including those conducting filling stations, are required by statute to pay a license tax of $5 per annum and in addition a tax of seven cents per gallon for every gallon of gasoline or other like products of petroleum sold (chaps. 15659 and 15788, Laws of Florida, Acts of 1931). It has long been settled that the Fourteenth Amendment does not prevent a state from imposing differing taxes upon different trades and professions or varying the rates of excise upon various products. *Bell's Gap R. Co.* v. *Pennsylvania*, 134 U. S. 232, 237; *Southwestern Oil Co.* v. *Texas*, 217 U. S. 114, 121–122. Clear and hostile discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of our governments, may be obnoxious to the Constitution, but in view of the imposition of taxes on the operation of filling stations by other acts, pursuant to the legislature's power of classification, we cannot declare their exemption from the tax laid by the chain store act offensive to the guaranties of the Fourteenth Amendment.

6. It is asserted that the act bears unevenly upon those who purchase directly from a wholesale house or manufacturer whose plant is outside the State, some of whom

also store the goods in Florida preparatory to retail sale, and those who purchase from a wholesaler within the State; that the former are engaged in interstate commerce, and the tax is as to them a burden upon that commerce. The claim merits no serious discussion. The tax is obviously laid for the privilege of operating stores in Florida, and attempts no discrimination between merchandise imported from another state and that produced in Florida. Compare *Emert* v. *Missouri*, 156 U. S. 296; *Armour & Co.* v. *Virginia*, 246 U. S. 1; *Sonneborn Bros.* v. *Cureton*, 262 U. S. 506. It levies no tax and lays no burden on the purchase in interstate commerce of articles for sale in Florida. *Kehrer* v. *Stewart*, 197 U. S. 60, 65; *East Ohio Gas. Co.* v. *Tax Commission*, 283 U. S. 465, 471. The tax on the value of merchandise in a retail store, or warehoused in Florida for sale in that store, even though incident on articles which have moved in interstate commerce, is laid after interstate commerce has ceased. Compare *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500; *Bacon* v. *Illinois*, 227 U. S. 504; *Texas Co.* v. *Brown*, 258 U. S. 466, 475; *Gregg Dyeing Co.* v. *Query*, 286 U. S. 472, 478.

7. The bill avers that the state officials charged with the administration of the act have failed to demand the tax and do not intend to collect it from the owners of stores in certain lines of business, such as furniture dealers. This alleged official dereliction is claimed to be an unconstitutional discrimination in the enforcement of the act. For this proposition appellants rely upon decisions such as *Cumberland Coal Co.* v. *Board of Revision*, 284 U. S. 23, and *Iowa-Des Moines Nat. Bank* v. *Bennett*, 284 U. S. 239, holding a failure to assess all property taxed *ad valorem* at the same proportion of its value to be a denial of equal protection. The principle upon which those cases rest is that where a statute lays a tax upon property *ad valorem* at an even and equal rate, discrimi-

nation may result from the fact that the assessing officials systematically and intentionally value some property subject to the tax at a proportion of its true value different from that fixed with respect to other like property. They do not support the appellants' contention that where the taxing officials fail and neglect to exact the tax from some persons alleged to owe it, all others who are subject to the levy are in virtue of such omission exempt. This court has said that in the case of unequal and discriminatory assessment, to hold that the complaining taxpayer's only remedy is to have the assessments on all the other property raised to a level equal with that of his own is in effect to deny any remedy whatever. As a consequence redress is afforded by requiring the assessing body to revise the complainant's assessment to the level of those upon other like property. Appellants insist that by analogy they are entitled to be exempt, if others are improperly relieved from taxation.

Under the law of Florida every unit of the taxpaying public has an interest in having all property subject to taxation legally assessed, and may in behalf of himself and others in like situation require that all property subject to taxation be placed on the tax books and bear its proportionate part of the expense of government. The appellants, if they deem the tax illegally omitted in certain cases, may apply for a writ of mandamus to compel the taxing officials to do their duty. *State ex rel. Dofnos Corp.* v. *Lehman,* 100 Fla. 1401; 131 So. 333. Failure to collect the tax from some whose occupations fall within the provisions of the act, cannot excuse the appellants from paying what they owe. And certainly the remedy afforded by state law assures them equal treatment along with all others similarly situated.

8. We are told that the legislature of Florida would not have passed the act if any of its provisions were for

any reason to be inoperative, and we are asked, therefore, to declare the entire statute void.

Section 15 provides:

" If any section, provision or clause of this Act shall be declared invalid or unconstitutional, or if this Act as applied to any circumstances shall be declared invalid or unconstitutional, such invalidity shall not be construed to affect the portions of this Act not so held to be invalid or the application of this Act to other circumstances not so held to be invalid."

The operation of this section consequent on our decision is a matter of state law. While we have jurisdiction of the issue, we deem it appropriate that we should leave the determination of the question to the state court. See *King* v. *West Virginia,* 216 U. S. 92; *Schneider Granite Co.* v. *Gast Realty Co.*, 245 U. S. 288, 290; *Dorchy* v. *Kansas,* 264 U. S. 286, 291.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BRANDEIS, dissenting in part.

In my opinion, the judgment of the Supreme Court of Florida should be affirmed.

Florida Laws, 1931, Chapter 15,624 is legislation of the type popularly called Anti-Chain Store Laws. The statute provides for the licensing of retail stores by the State, the counties and the municipalities—a system under which large revenues may be raised. But the raising of revenue is obviously not the main purpose of the legislation. Its chief aim is to protect the individual, independently-owned, retail stores from the competition of chain stores. The statute seeks to do this, by subjecting the latter to financial handicaps which may conceivably compel their withdrawal from the State. An injunction

against its enforcement is sought on the ground that the law violates rights guaranteed by the Federal Constitution.

The Florida law is general in its terms. It prohibits the operation, after September 30, 1931, of any retail store without securing annually a license; and provides, among other things, for annual fees which are in part graduated. If the owner operates only one store the state fee is $5; if more than one, the fee for the additional stores rises by step increases, dependent upon both the number operated and whether all operated are located in a single county. The highest fee is for a store in excess of 75. If all of the stores are located in a single county, the fee for each store in excess of 75 is $40; if all are not located in the same county the fee is $50. Under this law, the owner of 100 stores not located in a single county pays for each store operated, on the average, $33.65; and if they were located in a single county the owner would pay for each store, on the average, $25.20. If the 100 stores were independently owned (although operated coöperatively as a so-called "voluntary chain") the annual fee for each would be only $5. The statute provides that the licenses shall issue to expire on September 30th of each calendar year. This suit was begun September 30th, 1931. The first license year had expired before the case was heard in this Court.

In its main features, this statute resembles the Indiana law discussed in *Tax Commissioners* v. *Jackson*, 283 U. S. 527. For the reasons there stated, the Court sustains like provisions in the Florida statute. But it declares arbitrary, and hence invalid, the novel provision imposing heavier license fees where the multiple stores of a single owner are located in more than one county, because it is "unable to discover any reasonable basis for this classification." There is nothing in the record to show affirmatively that the provision may not be a reasonable one in

view of conditions prevailing in Florida. Since the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute, its validity should, in my opinion, be sustained. *O'Gorman & Young* v. *Hartford Insurance Co.,* 282 U. S. 251, 257–8; *Railway Express Agency* v. *Virginia,* 282 U. S. 440, 444; *Hardware Dealers Mutual Fire Ins. Co.* v. *Glidden Co.,* 284 U. S. 151, 158; *Boston & Maine R. Co.* v. *Armburg,* 285 U. S. 234, 240; *Lawrence* v. *State Tax Commission,* 286 U. S. 276, 283.

There is, however, another ground on which this provision should be, and the whole statute could be, sustained—a ground not considered in the *Jackson* case and not pertinent there. Jackson was an individual. The plaintiffs here are all corporations. Though the provisions of the statutes in the two States are similar, certain rules of law applicable to the parties to the litigation are different.

The plaintiffs are thirteen corporations which engage in Florida exclusively in intrastate commerce. Each (except one) owns and operates a chain of retail stores within the State and some operate stores in more than one county. Several of the plaintiffs are organized under the laws of Florida; the rest under the laws of other States. No claim of discrimination as between the foreign and domestic corporations is made, compare *Southern Ry. Co.* v. *Greene,* 216 U. S. 400; *Hanover Fire Insurance Co.* v. *Harding,* 272 U. S. 494; nor could it be, since the statute affects both classes of corporations alike. The suit is brought as a class suit, for the benefit of all merchants similarly situated who may desire to avail themselves thereof. From certain allegations in the bill it may be inferred that there are at least two natural persons within the State who own and operate more than one store. But as no such person has intervened in the cause, we have no occasion to enquire whether the discrimination com-

plained of would be fatal as applied to natural persons. The plaintiffs can succeed only if the discrimination is unconstitutional as applied to them; that is, as applied to corporations. One who would strike down a statute must show not only that he is affected by it, but that as applied to him it exceeds the power of the State. This rule, acted upon as early as *Austin* v. *The Aldermen,* 7 Wall. 694, and definitely stated in *Supervisors* v. *Stanley,* 105 U. S. 305, 314, has been consistently followed since that time. Compare *Standard Stock Food Co.* v. *Wright,* 225 U. S. 540, 550; *Darnell* v. *Indiana,* 226 U. S. 390, 398; *Roberts & Schaefer Co.* v. *Emmerson,* 271 U. S. 50, 54–55; *Liberty Warehouse Co.* v. *Burley Tobacco Growers' Assn.,* 276 U. S. 71, 88. For the reasons to be stated, the discrimination complained of, and held arbitrary by the court is, in my opinion, valid as applied to corporations.

*First.* The Federal Constitution does not confer upon either domestic or foreign corporations the right to engage in intrastate commerce in Florida. The privilege of engaging in such commerce in corporate form is one which the State may confer or may withhold as it sees fit. Compare *Railway Express Agency* v. *Virginia,* 282 U. S. 440. See *Pembina Mining Co.* v. *Pennsylvania,* 125 U. S. 181, 184–5, 186; *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305, 314; *Hemphill* v. *Orloff,* 277 U. S. 537, 548. Florida might grant the privilege to one set of persons and deny it to others; might grant it for some kinds of business and deny it for others; might grant the privilege to corporations with a small capital while denying it for those whose capital or resources are large. Or, it might grant the privilege to private corporations whose shares are owned mainly by those who manage them and to corporations engaged in coöperative undertakings, while denying the privilege to other concerns called private, but whose shares are listed on a stock exchange—corpora-

tions financed by the public, largely through the aid of investment bankers. It may grant the privilege broadly, or restrict its exercise to a single county, city or town, and to a single place of business within any such subdivision of the State.

Whether the corporate privilege shall be granted or withheld is always a matter of state policy. If granted, the privilege is conferred in order to achieve an end which the State deems desirable. It may be granted as a means of raising revenue; or in order to procure for the community a public utility, a bank or a desired industry not otherwise obtainable; or the reason for granting it may be to promote more generally the public welfare by providing an instrumentality of business which will facilitate the establishment and conduct of new and large enterprises deemed of public benefit. Similarly, if the privilege is denied, it is denied because incidents of like corporate enterprise are deemed inimical to the public welfare and it is desired to protect the community from apprehended harm.

Here we are dealing only with intrastate commerce. Compare *Carley & Hamilton* v. *Snook*, 281 U. S. 66, 71. Since a State may fix the price for the privilege of doing intrastate commerce in corporate form, and the corporation is free to accept or reject the offer, the State may make the price higher for the privilege of locating stores in two counties than in one. Can it be doubted that a State, being free to permit or to prohibit branch banking, would be at liberty to exact a higher license fee from banks with branches than from those with only a single place of business; that it might exact a higher fee from those banks which have branches in several counties than it does from those whose branches are all within a single county; and that it might do so without obligation to justify, before some court, the reasonableness of the dif-

ference in the license fees?[1] The difference made by Florida in exacting a higher license fee for those concerns which do business in more than one county is similar in character to that suggested.

If the Florida statute had stated in terms that the license fee was exacted as compensation for the privilege of conducting multiple stores in corporate form, it seems clear that no corporation could successfully challenge its validity. Compare *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305; *Kansas City, F. S. & M. Ry. Co.* v. *Botkin,* 240 U. S. 227; *Nebraska ex rel. Beatrice Creamery Co.* v. *Marsh,* 282 U. S. 799. And since the State had the power so to do, the mere failure to state that such was the nature of the exaction does not render it invalid. Compare *Castillo v. McConnico,* 168 U. S. 674, 683. Nor does the fact that the plaintiffs had been admitted to the State prior to enactment of the statute. A State which freely granted the corporate privilege for intrastate commerce may change its policy. It may conclude, in the light of experience, that the grant of the privilege for intrastate commerce is harmful to the community and may decide not to grant the privilege in the future. It may go further in the process of exclusion. It may revoke privileges theretofore granted, compare *Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322, 343; *Crescent Oil Co.* v. *Mississippi,* 257 U. S. 129, since, in the absence of contract, there is no vested interest which requires the con-

[1] In only 9 states is state-wide branch banking permitted: Arizona, California, Delaware, Maryland, North Carolina, Rhode Island, South Carolina, Vermont, and Virginia. Of these, all except South Carolina and Maryland require the authorization of the appropriate state officer. See Federal Reserve Bulletin, April, 1930, pp. 258–266; *id.,* July, 1932, pp. 455–458. Congress prohibited the establishment of any branch national bank from 1863 to 1927; see *First National Bank* v. *Missouri,* 263 U. S. 640, 656–659. The law of that year authorized branches only within the same city; and only if the state laws so permitted. Act of February 25, 1927, 44 Stat. 1224, 1228, c. 191, § 7. Compare Act of February 25, 1933, 47 Stat. 907.

tinuance of a legislative · policy however expressed—whether embodied in a charter or in a system of taxation. *Citizens' Savings Bank* v. *Owensboro,* 172 U. S. 636, 644; *Texas & N. O. R. Co.* v. *Miller,* 221 U. S. 408, 414–415; *Erie R. Co.* v. *Williams,* 233 U. S. 685, 701; *Cheney Bros. Co.* v. *Massachusetts,* 246 U. S. 147, 157. Compare *Louisville Bridge Co.* v. *United States,* 242 U. S. 409.

If a State believes that adequate protection against harm apprehended or experienced can be secured, without revoking the corporate privilege, by imposing thereafter upon corporations the handicap of higher, discriminatory license fees as compensation for the privilege, I know of nothing in the Fourteenth Amendment to prevent it from making the experiment. The case at bar is not like those where a restriction upon the liberty of the individual may be attacked by showing that no evil exists, or is apprehended, or that the remedy provided cannot be regarded as appropriate to its removal. Nor is the case like those where a state regulation or state taxes burden interstate commerce. Compare *Welton* v. *Missouri,* 91 U. S. 275; *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489; *Caldwell* v. *North Carolina,* 187 U. S. 622, 626; *Davis* v. *Farmers Co-operative Equity Co.,* 262 U. S. 312; *Buck* v. *Kuykendall,* 267 U. S. 307. Cases like *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1; *Looney* v. *Crane Co.,* 245 U. S. 178; *Terral* v. *Burke Construction Co.,* 257 U. S. 529, have no application to the situation here discussed.

Whether the citizens of Florida are wise in seeking to discourage the operation of chain stores is, obviously, a matter with which this Court has no concern. Nor need it, in my opinion, consider whether the differences in license fees employed to effect such discouragement are inherently reasonable, since the plaintiffs are at liberty to refuse to pay the compensation demanded for the corporate privilege and withdraw from the State, if they consider the price more than the privilege is worth. But a review of the legislation of the several States by which

all restraints on corporate size and activity were removed, and a consideration of the economic and social effects of such removal, will help to an understanding of Anti-Chain Store Laws; and will show that the discriminatory license fees prescribed by Florida, even if treated merely as a form of taxation, were laid for a purpose which may be appropriately served by taxation, and that the specific means employed to favor the individual retailer are not constitutionally objectionable.

*Second.* The prevalence of the corporation in America has led men of this generation to act, at times, as if the privilege of doing business in corporate form were inherent in the citizen; and has led them to accept the evils attendant upon the free and unrestricted use of the corporate mechanism as if these evils were the inescapable price of civilized life and, hence, to be borne with resignation. Throughout the greater part of our history a different view prevailed. Although the value of this instrumentality in commerce and industry was fully recognized, incorporation for business was commonly denied long after it had been freely granted for religious, educational and charitable purposes.[2] It was denied because of fear. Fear of encroachment upon the liberties and opportunities of the individual. Fear of the subjection of labor to capital. Fear of monopoly. Fear that the absorption of capital by corporations, and their perpetual life, might bring evils similar to those which attended mortmain.[3]

---

[2] See Joseph S. Davis, Essays in the Earlier History of American Corporations, Vol. II, pp. 16–18, 308–309. New York permitted incorporation under a general law for some business purposes in 1811. By 1850 a general law permitting incorporation for a limited business purpose had become common; and after 1875 extension of the privilege to every lawful business became so.

[3] It was doubtless because of this, that the earlier statutes limited the life of corporations to fixed terms of 20, 30 or 50 years. See the statutes cited in subsequent notes.

There was a sense of some insidious menace inherent in large aggregations of capital, particularly when held by corporations. So, at first, the corporate privilege was granted sparingly; and only when the grant seemed necessary in order to procure for the community some specific benefit otherwise unattainable. The later enactment of general incorporation laws does not signify that the apprehension of corporate domination had been overcome. The desire for business expansion created an irresistible demand for more charters; and it was believed that under general laws embodying safeguards of universal application the scandals and favoritism incident to special incorporation could be avoided. The general laws, which long embodied severe restrictions upon size and upon the scope of corporate activity, were, in part, an expression of the desire for equality of opportunity.[4]

---

The power of legislatures to grant special charters was sometimes strictly limited, even before the adoption of constitutional amendments withdrawing that power entirely. Thus the New York Constitution adopted in convention in November, 1821, and by popular vote in January, 1822, required the assent of two-thirds of each house for any act "creating, continuing, altering or renewing any body politic or corporate"—Art. 7, § 9; L. 1822–24, p. x. Similar provisions were included in the Delaware Constitution of 1831, Art. 2, § 17; in the Florida Constitution of 1838, Art. 13, § 2 (with an additional requirement of three months' public notice); and in the Michigan Constitution of 1835, Art. 12, § 2. The Rhode Island Constitution of 1842, Art. 4, § 17, required a bill for a corporate charter to be continued to the next legislature. The Constitution of Illinois, adopted in 1848, provided that no act authorizing the formation of a corporation with banking powers should be effective unless ratified by popular vote— Art. X, § 5; and a similar provision was included in the Constitution of Wisconsin, 1848, Art. II, §§ 4, 5.

[4] That the desire for equality and the dread of special privilege were largely responsible for the general incorporation laws is indicated by the fact that many States included in their constitutions a prohibition of the grant of special charters. The first constitutional provision requiring incorporation under general laws seems to be that in the New

550

(a) Limitation upon the amount of the authorized capital of business corporations was long universal.[5] The maximum limit frequently varied with the kinds of business to be carried on, being dependent apparently upon the supposed requirements of the efficient unit. Although the statutory limits were changed from time to time this principle of limitation was long retained. Thus

York constitution of 1846—Art. 8, § 1 (except where objects of incorporation were not thus attainable). Other States followed in later years. Ala. 1867, Art. 13; Ark. 1874, Art. 12; Calif. 1849, Art. 4, § 31; Colo. 1876, Art. 15. § 2; Del. 1897, Art. 9, § 1; Ga. 1868, Art. 3, § 6 (amended by Laws 1890–1891, p. 55); Idaho 1889, Art. 11, § 2; Ill. 1848, Art. 10, § 1; Ind. 1851, Art. 11, § 13; Iowa 1846, Art. 8, § 2; Kans. 1855, Art. 13, § 1; La. 1864, Art. 121; Me. 1875, Art. 4, § 14 (except where objects could not thus be attained); Md. 1851, Art. 3, § 47 (except where objects could not thus be attained); Mich. 1850, Art. 15, § 1; Minn. 1857, Art. 10, § 2; Miss. 1890, Art. 7, § 178; Mo. 1865, Art. 8, § 4; Mont. 1889, Art. 15, § 2; Neb. 1866, Tit. Corporations, § 1; Nev. 1864, Art. 8, § 1; N. J. 1875, Art. 4, § 7; N. Car. 1868, Art. 8, § 1 (except where objects could not thus be attained); N. Dak. 1889, Art. 7, § 131; Ohio 1851, Art. 13, § 1; Ore. 1857, Art. 11, § 2; Penna. 1874, Art. 3, § 7; S. Dak. 1889, Art. 17, § 1; Tenn. 1870, Art. 11, § 8; Texas 1876, Art. 12, § 1; Utah 1895, Art. 12, § 1; Va. 1902, Art. 12, § 154; Wash. 1889, Art. 12, § 1; W. Va. 1872, Art. 11, § 1; Wis. 1848, Art. 11, § 1 (except where objects could not thus be attained).

[5] *Alabama*—until 1876, the limit was $200,000. Rev. Code 1867 (Walker), part 2, c. 3, § 1759; Act No. 282, March 3, 1870, § 3, L. 1869–70, p. 320. Under the Code of 1876 (Wood & Roquemore), § 1811, p. 509 (Act of February 28, 1876, § 9, L. 1875–76, p. 244), the limit was $1,000,000. Under the Code of 1896 (Civil, c. 28, § 1259, p. 429), it was $10,000,000. *Arizona*—Comp. L. 1864–71, c. 51, § 19, p. 486—$5,000,000. *Illinois*—$300,000, Act of June 22, 1852, L. p. 135; $1,000,000, Act of February 17, 1857, L. p. 110; $500,000, Act of February 18, 1857, L. p. 161. *Maine*—$50,000, Act of March 19, 1862, c. 152, § 3; $200,000, Act of February 28, 1867, c. 125, § 7; February 26, 1870, c. 93, § 1; $500,000, Act of February 3, 1876, c. 65, § 2; $2,000,000, Act of February 14, 1883, c. 116, § 1; $10,000,000, Act of March 25, 1891, c. 99, § 1. The Act of March 21, 1901, c. 229, was the first to prescribe no limit. *Wisconsin*—Until 1879, $250,000, Rev. Stat. 1878, c. 86, § 1772, p. 516; Act of February 7, 1879, c. 7,

in New York the limit was at first $100,000 for some businesses and as little as $50,000 for others.[6] Until 1881 the maximum for business corporations in New York was $2,000,000; and until 1890, $5,000,000.[7] In Massachusetts the limit was at first $200,000 for some businesses and as little as $5,000 for others.[8] Until 1871 the maximum for mechanical and manufacturing corporations was

---

L. 1879, p. 10. Limits were imposed in some cases even by *Delaware* (March 21, 1871, c. 152, 14 Del. L. 299) and *New Jersey* (March 30, 1865, c. 379, L. 1865, p. 707; March 31, 1869, c. 374. L. 1869, p. 1001). And see the notes following.

[6] The Act of March 22, 1811, c. 67, limited the capital stock to $100,000. The purposes for which corporations might be formed under this law were limited to the following: manufacturing woolen, cotton or linen goods; making glass; making, from ore, bar-iron, anchors, mill-irons, steel, nail rods, hoop iron, ironmongery, sheet lead, shot, white lead and red lead. The Act of April 14, 1817, c. 223, extended the purposes to include the manufacture of morocco and other leather; but for such objects the capital stock was not to exceed $60,000. Further limitations were added from time to time, with the general limitation of $100,000, or a lower limitation; as, for example, $50,000 for corporations manufacturing salt. L. 1821, c. 231, § 19. The Act of 1852, c. 228, provided for the incorporation of companies for ocean navigation, and limited the authorized capital to $2,000,000; this was increased to $4,000,000 by Act of 1853, c. 124; to $8,000,000 by Act of 1866, c. 322; to $20,000,000 by Act of 1867, c. 419; and this was decreased to $4,000,000 by Act of 1875, c. 445. The Act of 1853, c. 117, provided for the incorporation of building companies, and set a maximum of $500,000; this was increased to $1,000,000 by Act of 1870, c. 773. The Act of 1854, c. 232, provided for the incorporation of companies to navigate lakes and rivers, and set a maximum of $1,000,000; this was increased to $2,000,000 by Act of 1865, c. 691. The Act of 1874, c. 143, provided for the incorporation of hotel companies, and set a maximum of $1,000,000.

[7] The General Business Corporation Act of 1875, c. 611, § 11, set a maximum of $2,000,000. This was increased to $5,000,000 by Act of 1881, c. 295.

[8] The first general act, May 15, 1851, c. 133, permitted incorporation for "any kind of manufacturing, mechanical, mining or quarrying business." It limited the maximum to $200,000. Act of March 19, 1855, c. 68, § 1, increased the maximum to $500,000. The act of

552

$500,000; and until 1899, $1,000,000.[9] The limit of $100,000 was retained for some businesses until 1903.[10]

In many other states, including the leading ones in some industries, the removal of the limitations upon size was more recent. Pennsylvania did not remove the limits

---

May 9, 1870, c. 224 (Acts & Res. 1870, p. 154) repealed previous acts (§ 69) and made more comprehensive provisions; cutting, storing and selling ice, or carrying on any agricultural, horticultural, mechanical, mining, quarrying or manufacturing business, printing and publishing— a maximum of $500,000 (§ 2); coöperation in any of the above businesses and coöperative trade—$50,000 (§ 3); opening outlets, canals or ditches, propagation of herrings and alewives—$5,000 (§ 4); making and selling gas for light in cities or towns—$500,000 (§ 5); common carriage of goods—$1,000,000 (§ 6). Later acts provided for the manufacture and distribution of gas for steam, heat, power, and cooking; and for the furnishing of hydrostatic and pneumatic pressure. A maximum of $500,000 was prescribed. Acts of April 9, 1879, c. 202; May 15, 1885, c. 240; April 11, 1891, c. 189; May 27, 1893, c. 397. The same limit was prescribed for corporations to erect and maintain hotels, public halls, and buildings for manufacturing purposes. Acts of April 24, 1872, c. 244; March 9, 1888, c. 116.

[9] The maximum limit was raised to $1,000,000 for manufacturing and mechanical business by Act of March 22, 1871, c. 110, § 1; and for mining corporations by Act of May 3, 1875, c. 177, § 3; and to $100,000 for coöperative trade by Act of April 11, 1879, c. 210. By Act of April 14, 1873, c. 179, the general act was extended to the common carriage of persons—except by railroad—and, the limit of $1,000,000 was retained. The Act of April 14, 1874, c. 165, authorized incorporation for " any lawful business," not specifically provided for, and limited the amount of stock to $1,000,000. The maximum limit for manufacturing and mechanical corporations was removed by Act of March 28, 1899, c. 199. For all the other corporate purposes, the limitations above-named remained until the passage of the Business Corporation Law, June 17, 1903, c. 437. By that time commissions with power to supervise the issues of public service corporations had long been established. Act of June 11, 1885, c. 314; Act of June 5, 1894, c. 450; Act of June 5, 1894, c. 452; Act of June 9, 1894, c. 462.

[10] For all except mechanical and manufacturing corporations, the limitations set out in notes 8 and 9, *supra,* remained until the passage of the Business Corporation Law, June 17, 1903, c. 437.

until 1905.[11] Its first general act not having contained a maximum limit, that of $500,000 was soon imposed.[12] Later, it was raised to $1,000,000; and, for iron and steel companies, to $5,000,000.[13] Vermont limited the maximum to $1,000,000 until 1911[14] when no amount over $10,000,000 was authorized if, in the opinion of a judge of the supreme court, such a capitalization would tend "to create a monopoly or result in restraining competition in trade."[15] Maryland limited until 1918 the capital of mining companies to $3,000,000; and prohibited them from holding more than 500 acres of land (except in Allegany County, where 1,000 acres was allowed).[16] New Hampshire did not remove the maximum limit until 1919.[17] It had been $1,000,000 until 1907,[18] when it was increased to $5,000,000.[19] Michigan did not remove the maximum limit until 1921.[20] The maximum, at first

[11] Act of April 22, 1905, No. 190, amending Act of February 9, 1901, No. 1; 5 Purdon's Digest, 1905–09 Supp. (13th ed.), p. 5340.

[12] The first Act passed in 1849, L. 1849, No. 368, p. 563, contained no limit. But a limit of $500,000 was imposed by Act of July 18, 1863, No. 949, L. 1864, p. 1102.

[13] The limit was raised to $1,000,000 for iron and steel corporations by Act of March 25, 1873, No. 4, L. 1873, p. 28, and it was extended to other corporations by Act of April 29, 1874, L. 1874, p. 73, which also increased the limit for the former to $5,000,000. The Act of April 18, 1873, No. 54, L. 1873, p. 76, had required that the Attorney General be satisfied of the reasonableness of so large a capitalization.

[14] Pub. Stat. (1906), Tit. 25, c. 187, § 4311, p. 830.

[15] Act of January 28, 1911, No. 143, L. 1910, pp. 140, 141–142. This provision was repealed by General Corporation Act, April 1, 1915, No. 141, L. 1915, p. 222.

[16] Bagby's Code (1911), Art. 23, § 245, p. 648; repealed by Act of April 10, 1918, c. 417, L. 1918, p. 884.

[17] Business Corporation Law, March 28, 1919, c. 92, L. 1919, p. 113.

[18] Pub. Stat. (1901), c. 147, § 6, p. 470.

[19] Act of April 5, 1907, c. 129, L. 1907, p. 131.

[20] General Corporation Act, No. 84, April 26, 1921, L. 1921, p. 125, contains no limit on the amount of stock. Corporate life is limited to 30 years, § 5(b).

554

$100,000,[21] had been gradually increased until in 1903 it became $10,000,000 for some corporations and $25,000,000 for others;[22] and in 1917 became $50,000,000.[23] Indiana did not remove until 1921 the maximum limit of $2,000,000 for petroleum and natural gas corporations.[24] Missouri did not remove its maximum limit until 1927.[25] Texas still has such a limit for certain corporations.[26]

(b) Limitations upon the scope of a business corporation's powers and activity were also long universal. At first, corporations could be formed under the general laws only for a limited number of purposes—usually those which required a relatively large fixed capital, like transportation, banking, and insurance, and mechanical, min-

---

[21] Act 148, May 18, 1846, § 6, L. 1846, pp. 265, 267—corporation for mining or manufacturing iron, copper, etc.

[22] Act 232, June 18, 1903, 3 Howell's Mich. Stat. (1914), § 9533, p. 3815. The $25,000,000 maximum was for mercantile and manufacturing corporations. It had previously been raised to $5,000,000 by Act 232, September 19, 1885, § 2, L. 1885, p. 343. For mining corporations, a different maximum was fixed: $500,000 by Act 41, February 5, 1853, L. 1853, p. 53; $2,500,000 by Act 113, May 11, 1877, § 4, L. 1877, p. 87; and $10,000,000 by Act 233, September 17, 1903, Howell's Mich. Stat. (1914), § 7783, p. 3158, § 7804, p. 3165.

[23] Act 254, May 10, 1917, § 2, L. 1917, pp. 529, 530. See Dodge v. Ford Motor Co., 204 Mich. 459, 494; 170 N. W. 668.

[24] Until 1921, corporations for various objects were formed under various acts. For mining corporations, a limit of $2,000,000 was prescribed. 2 Burns' Ind. Stat. (1914), § 5137; 2 id. (1926), § 5547. In 1921, a general act, applicable to corporations for any lawful business, was passed, without limitation on the amount of stock. Act of February 28, 1921, c. 35, L. 1921, p. 93.

[25] By Act of March 30, 1907, L. 1907, p. 166, the maximum was increased to $50,000,000 from the $10,000,000 limit previously in force; Rev. Stat. 1899, c. 12, Art. 9, § 1320, p. 429; Rev. Stat. 1919, c. 90, Art. 7, § 10152. The act was repealed and no maximum provided in Act of April 8, 1927, L. 1927, p. 395; 1927 Supp. to Rev. Stat. § 10152.

[26] I Rev. Stat. (1925), Tit. 32, Art. 1302, ¶¶ 15, 16, 27. See Act of March 9, 1925, c. 51, L. 1925, p. 188.

ing, and manufacturing enterprises.[27]   Permission to incorporate for " any lawful purpose "[28] was not common until 1875; and until that time the duration of corporate franchises was generally limited to a period of 20, 30, or 50 years.[29]   All, or a majority, of the incorporators or directors, or both, were required to be residents of the incorporating state.[30]   The powers which the corporation might exercise in carrying out its purposes were sparingly conferred and strictly construed.   Severe limitations were imposed on the amount of indebtedness, bonded or other-

---

[27] See notes 6 and 8, *supra.*   The first general act in New Jersey was that of February 25, 1846, L. 1846, p. 64.   In Michigan—May 18, 1846, Act 148, L. 1846, p. 265.   In Illinois—February 10, 1849, L. 1849, p. 87.   In Pennsylvania—April 7, 1849, No. 368, L. 1849, p. 563.   In Massachusetts—May 15, 1851, c. 133, Gen. Stat. 1860 (2 ed.), p. 341.   In Maine—March 19, 1862, c. 152, L. 1862, p. 118. In Delaware—March 21, 1871, c. 152, 14 Del. L. 229.   In general, the objects of incorporation under these acts were limited to mining, manufacturing, mechanical or chemical business; separate acts governed the formation of banking, insurance, and transportation companies. Authority to incorporate for mercantile business, where specifically provided, was given relatively late.   E. g., Md. Laws 1894, c. 599; Tenn. Acts 1887, c. 139; Vt. Laws 1884, No. 105; compare Ind. Laws 1889, c. 81, § 1.   And see Cook on Corporations (1889), p. 91: " The general corporation laws [of Pennsylvania] do not provide for mercantile corporations, but these are practically incorporated by means of ' partnership associations.' . . ."

[28] New York—L. 1866, c. 838, p. 1896; L. 1875, c. 611, p. 755: Illinois—July 1, 1872, L. 1872, p. 296.   Massachusetts—Act of April 14, 1874, c. 165, § 1.   Maine—February 3, 1876, c. 65, L. 1876, p. 51. Other States followed shortly.

[29] In 1903, almost half the states limited the duration of corporate existence to periods of from 20 to 50 years.   See Report of the Committee on Corporation Laws of Massachusetts (1903), pp. 162–164.

[30] E. g., Calif. Civ. Code (1885), § 285; Conn. Gen. Stat. (1888), § 1944; Ill. Rev. Stat. (1891), c. 114, § 11; Me. Rev. Stat. (1883), pp. 412, 467; Md. Gen. L. (1888), p. 299; Ohio Rev. Stat. (1886), § 3236; Pa. Dig. (Purdon's 1905), Tit. Corporations, § 63.   Compare Wis. Stat. (1908), c. 85, § 1750 (chief managing officer or superintendent must reside in state, except in case of interstate railroad).

wise.[31]   The power to hold stock in other corporations was not conferred or implied.[32]   The holding company was impossible.

---

[31] See, e. g., N. Y. Laws 1825, p. 448, § 3, 1 Rev. Stat. (1852), c. 18, Tit. 4, § 3, p. 1175; N. Y. Laws 1875, c. 611, § 22; Ill. Laws 1849, p. 87, § 22, p. 92; Ill. Laws 1872, p. 296, § 16, p. 300; Pa. Laws 1874, p. 73, § 13, p. 80; Maine Laws 1867, p. 72, § 24, p. 75;·N. J. Laws 1846, p. 64, § 28, p. 69; N. J. Laws 1874, p. 124, § 16, p. 129.   In 1903, almost half the states retained limitations on corporate indebtedness.   See Report of the Committee on Corporation Laws of Massachusetts (1903), pp. 165–166.

[32] See Noyes, Intercorporate Relations (2d ed., 1909), pp. 473–498; Morawetz, Private Corporations (2d ed., 1886), § 431.   New Jersey was the first state to confer the general power of intercorporate stockholding.   N. J. Laws 1888, pp. 385, 445, cc. 269, 295; N. J. Laws 1893, c. 171, p. 301.   See Gilbert H. Montague, Trusts of Today (1904), pp. 20–21; C. R. Van Hise, Concentration and Control (rev. ed., 1914), p. 70; W. Z. Ripley, Trusts, Pools and Corporations (rev. ed., 1916), pp. xix–xx; Eliot. Jones, The Trust Problem in the United States (1921), p. 30; Maurice H. Robinson, The Holding Corporation, 18 Yale Review, pp 390, 406–407.   Although unconditional power was not conferred until the Act of 1893, supra, it had been the practice of corporations formed in New Jersey to purchase the shares of other corporations.   See Edward S. Keasbey, New Jersey and the Great Corporations, 13 Harvard Law Review, pp. 198, 207, 208.   In no other state had there been a provision permitting the formation of holding companies, although by special act, notably in Pennsylvania, a few such companies had been formed.   See James C. Bonbright and Gardiner C. Means, The Holding Company (1932), pp. 58–64.   The scandal to which the series of Pennsylvania holding-company charters gave rise led to a constitutional amendment in that state forbidding the grant of special charters.   Pa. Laws 1874, p. 8; Pa. Const., Art. III, § 7.   See Bonbright and Means, supra, at p. 60.   New York, like other states, had specifically prohibited intercorporate stockholding, except where the stock held was that of a corporation supplying necessary materials to the purchasing corporation, or where it was taken as security for, or in satisfaction of, an antecedent debt.   N. Y. Laws 1848, c. 40, § 8; 1876, c. 358; 1890, c. 564, § 40; 1890, c. 567, § 12.   See De La Vergne Co. v. German Savings Institution, 175 U. S. 40, 54–58.

(c) The removal by the leading industrial States of the limitations upon the size and powers of business corporations appears to have been due, not to their conviction that maintenance of the restrictions was undesirable in itself, but to the conviction that it was futile to insist upon them; because local restriction would be circumvented by foreign incorporation. Indeed, local restriction seemed worse than futile. Lesser States, eager for the revenue [33] derived from the traffic in charters, had removed safeguards from their own incorporation laws.[34]

---

[33] The filing fees and franchise taxes are commonly measured by the authorized or issued stock. See National Industrial Conference Board, State and Local Taxation of Business Corporations (1931), Appendix B, pp. 138–159. And for the earlier laws, utilizing the same basis, see Report of the Massachusetts Committee on Corporation Laws (1903), pp. 265–288; House Committee on the District of Columbia, Report of Hearings of January 16, 1905, on H. R. 11811 and 12303 (Gov't Ptg. Office 1905) pp. 24–28.

[34] The traffic in charters quickly became widespread. In 1894 Cook on Stock and Stockholders (3d ed.) Vol. II, pp. 1604–1605 thus described the situation: "New Jersey is a favorite state for incorporations. Her laws seem to be framed with a special view to attracting incorporation fees and business fees from her sister states and especially from New York, across the river. She has largely succeeded in doing so, and now runs the state government very largely on revenues derived from New York enterprises. . . .

"Maine formerly was a resort for incorporators, but a recent decision of its highest court holding stockholders liable on stock which has been issued for property, where the court thought the property was not worth the par value of the stock, makes Maine too dangerous a state to incorporate in, especially where millions of dollars of stock are to be issued for mines, patents and other choice assortments of property. . . .

"West Virginia for the past ten years has been the Snug Harbor for roaming and piratical corporations. . . . The manufacture of corporations for the purpose of enabling them to do all their business elsewhere seems to be the policy of this young but enterprising state. Its statutes seem to be expressly framed for that purpose. . . ."

Companies were early formed to provide charters for corporations in states where the cost was lowest and the laws least restrictive.[35] The states joined in advertising

In 1906 John S. Parker thus described the practice, in his volume Where and How—A Corporation Handbook (2d ed.), p. 4: "Many years ago the corporation laws of New Jersey were so framed as to invite the incorporation of companies by persons residing in other states and countries. The liberality and facility with which corporations could there be formed were extensively advertised, and a great volume of incorporation swept into that state. . . .

"The policy of New Jersey proved profitable to the state, and soon legislatures of other states began active competition. . . .

"Delaware and Maine also revised their laws, taking the New Jersey act as a model, but with lower organization fees and annual taxes. Arizona and South Dakota also adopted liberal corporation laws, and contenting themselves with the incorporation fees, require no annual state taxes whatever.

"West Virginia for many years has been popular with incorporators, but in 1901, in the face of the growing competition of other states, the legislature increased the rate of annual taxes." And West Virginia thus lost her popularity. See Conyngton and Bennett, Corporation Procedure (rev. ed. 1927), p. 712. On the other hand, too drastic price cutting was also unprofitable. The bargain prices in Arizona and South Dakota attracted wildcat corporations. Investors became wary of corporations organized under the laws of Arizona or South Dakota and both states fell in disrepute among them and consequently among incorporators. See Conyngton on Corporate Organizations (1913), ch. 5.

[35] Thus, in its pamphlet, "Business Corporations Under the Laws of Maine" (1903), the Corporation Trust Co. enumerated among the advantages of the Maine laws: the comparatively low organization fees and annual taxes; the absence of restrictions upon capital stock or corporate indebtedness; the authority to issue stock for services as well as property, with the judgment of the directors as to their value conclusive; and, significantly enough, "the method of taxation, which bases the annual tax upon the stock issued, does not necessitate inquiry into or report upon the intimate affairs of the corporation." See also its pamphlet "Business Corporations Under the Laws of Delaware" (1907). See also the Red Book on Arizona Corporation Laws (1908), published by the Incorporating Company of Arizona, especially p. 5: "The remoteness of Arizona from the Eastern and

their wares.[36]   The race was one not of diligence but of laxity.[37]   Incorporation under such laws was possible; and the great industrial States yielded in order not to

Southern States has in a measure delayed, the promulgation of the generousness of its laws.   New Jersey, Delaware and West Virginia have become widely known as incorporating states.   More recently Arizona, Dakota, New Mexico and Nevada have come into more or less prominence by the passage of laws with liberal features."

[36] Thus, in an official pamphlet containing the corporation laws of Delaware (1901), the Secretary of State wrote in the preface: "It is believed that no state has on its statute books more complete and liberal laws than these;" and the outstanding advantages were then enumerated.   See also a pamphlet "Organization of Corporations," issued by the Secretary of State of Maine in 1904.   See also "The General Corporation Act of New Jersey" (1898), edited by J. B. Dill, issued by the Secretary of State: "Since 1875 it has been the announced and settled policy of New Jersey to attract incorporated capital to the State. . . ."   P. xvii.   And "The General Corporation Laws of West Virginia" (1905), published by the Secretary of State, containing, at pp. 209–210, a summary of the advantages of incorporating in West Virginia.   For other examples, see Henry R. Seager and Charles A. Gulick, Jr., Trust and Corporation Problems (1929), c. 4.

[37] A change in the policy of New Jersey was urged by Woodrow Wilson in his inaugural address as Governor.   "If I may speak very plainly, we are much too free with grants of charters to corporations in New Jersey.   A corporation exists, not of natural right, but only by license of law, and the law, if we look at the matter in good conscience, is responsible for what it creates. . . .   I would urge, therefore, the imperative obligation of public policy and of public honesty we are under to effect such changes in the law of the State as will henceforth effectually prevent the abuse of the privilege of incorporation which has in recent years brought so much discredit upon our State. . . .   If law is at liberty to adjust the general conditions of society itself, it is at liberty to control these great instrumentalities which nowadays, in so large part, determine the character of society."   Minutes of Assembly of New Jersey, January 17, 1911, pp. 65, 69; reprinted in Public Papers of Woodrow Wilson (ed. by Baker and Dodd), Vol. II, pp. 273, 274, 275.   In 1913 the so-called "Seven-Sisters" Acts were passed by New Jersey, forbidding, among other things, intercorporate stockholding.   Laws 1913, c. 18.   These, in turn, were repealed in 1917.   Laws 1917, c. 195.   The report recom-

lose wholly the prospect of the revenue and the control incident to domestic incorporation.

The history of the changes made by New York is illustrative. The New York revision of 1890, which eliminated the maximum limitation on authorized capital, and

---

mending the repeal stated: " Those laws now sought to be repealed are harmful to the State because there is much uncertainty as to their meaning, with the result that those who would have otherwise incorporated here or remained here are going to other States. There is no gain to the people of the country, but this State loses a revenue which is perfectly legitimate. We doubt not that much of the adverse criti- ' cism outside of the State which was directed against New Jersey and its corporation laws prior to 1913 was due as much to the desire to divert the organization of corporations to other States as it was to prevent evils which might have arisen, and New Jersey fell for the criticism. To whatever cause may be attributed the loss of revenue to the State, it is plain that it is a condition and not a theory which confronts the State, as the following figures will show: . . . Such losses mean a serious depletion of the revenues of the State, and, unless a different policy is pursued, it will not be long before the corporation business of the State will have been reduced to a minimum. We believe such conditions justify the appointment of the Commission and will also justify the Legislature in adopting the result of our investigation and embodied in the proposed revision." Report of the Commission to Revise the Corporation Laws of New Jersey, 1917, pp. 7–8

For more recent movements, see A. A. Berle and Gardiner C. Means, The Modern Corporation and Private Property (1932), p. 206, n. 18: "As significant of the trend towards that corporate mechanism with the broadest powers to the management, it is interesting to note the steady trend towards the states having a loose incorporation law. Of the 92 holding corporations mentioned above [those whose securities were listed on the New York Stock Exchange and were active in 1928] 44 were organized in Delaware, all of them being formed since 1910. Indeed, of the 44 holding corporations now chartered in that state, 25 were incorporated there between the years 1925 and 1928. In the less liberal New York State 13 of the above holding companies were formed, 6 of them having been chartered between 1910 and 1920, while only 4 were formed since 1920. Ten of the holding companies were chartered in Maryland, one in 1920 and the remaining 9 between 1923 and 1928, presumably in large measure as a result of the looseness of

permitted intercorporate stockholding in a limited class of cases,[38] was passed after a migration of incorporation from New York, attracted by the more liberal incorporation laws of New Jersey.[39] But the changes made by New York in 1890 were not sufficient to stem the tide.[40] In

the Maryland corporation law of 1923. New Jersey, a relatively popular state at the turn of the century shows only two of the holding company charters granted there since 1910; while Virginia shows 7 such charters.

"Combined holding and operating corporations likewise show a steady trend towards Delaware. Of the whole list, 148 of the 573 corporations hold Delaware charters, most of them relatively recent; New York is second with 121, most of them relatively old; New Jersey third with 87, most of which grow out of the great merger period from 1898–1910."

Corporations formed in one state by citizens of another state, to do business in the state of their residence, were frequently subjected to collateral attack. Generally the courts felt bound to uphold the corporate status. See the cases in J. H. Sears, The New Place of the Stockholder (1929), Appendix G. Occasionally, however, states legislated against the practice. Thus California enacted that the statutory liability of stockholders should apply to those in foreign as well as in domestic corporations. In two cases where the foreign corporation was organized specifically to do business in California this provision was held applicable. *Pinney* v. *Nelson*, 183 U. S. 144; *Thomas* v. *Matthiessen*, 232 U. S. 221. And more recently this Court has sustained a constitutional provision of Virginia which prohibits foreign public service companies from doing an intrastate business in the state. *Railway Express Agency* v. *Virginia*, 282 U. S. 440. The provision was adopted in the light of widespread incorporation of such companies in West Virginia and New Jersey. See Debates of Constitutional Convention of Virginia, 1901–1902, Vol. II, p. 2811.

[38] One corporation was allowed to hold stock in others so long as the latter were engaged in manufacturing materials, etc., necessary for the former; and in others, which used products of the former. Business Corporation Law, 1890, c. 567, § 12.

[39] See note 34, *supra*.

[40] See Report of N. Y. Joint Committee on Trusts, March 9, 1897, 120th Sess., Sen. Doc. No. 30, pp. 3–4: "When in 1890 the Court of Appeals in this State pronounced its final judgment against the system of trust organization then in vogue [*New York* v. *North River*

1892, the Governor of New York approved a special charter for the General Electric Company, modelled upon the New Jersey Act, on the ground that otherwise the enterprise would secure a New Jersey charter.[41] Later in the same year the New York corporation law was again revised, allowing the holding of stock in other corporations.[42] But the New Jersey law still continued to be more attractive to incorporators.[43] By specifically providing that corpora-

*Sugar Refining Co.*, 121 N. Y. 582; 24 N. E. 834], the 'trust' became a thing of the past, existing trust agreements were dissolved and under the permission of existing laws the constituent elements held together under such agreements, became incorporated in the State of New Jersey and in other jurisdictions, where, either by accident or by design, the law of incorporation was so adjusted that by the simplest formality a trust declared unlawful and a conspiracy against public welfare might continue its career. . . . .

"The corporation laws of the State of New York at that time differed essentially from the laws of the State of New Jersey in that they did not, as did the latter, permit the acquisition by one corporation of the capital stock of another, and consequently there followed an immediate migration of trusts to the State of New Jersey to secure corporate charters there and thus avoid complications in which the decision of the Court of Appeals threatened to involve them:"

[41] N. Y. Laws 1892, c. 323. "The measure is approved because it is claimed that its objects cannot well be secured under general laws, and because its approval will keep within the State a corporation which professes to be ready to invest a large amount of capital, and which, without the concessions allowed by its proposed charter, would be incorporated under the laws of New Jersey." Public Papers of Governor Flower, 1892, p. 104. Quoted in James B. Dill, "Some Aspects of New Jersey's Corporate Policy," Address before the Pennsylvania Bar Association, June 29, 1903, Rep. Pa. Bar Assn., 1903, pp. 265, 267.

[42] N. Y. Laws 1892, c. 688, § 40.

[43] The New York Evening Post, March 23, 1896, said: "The *Evening Post* has frequently pointed out that New York capital is driven to shelter in New Jersey by reason of the more liberal laws of that State governing the incorporation of companies as compared with the laws of New York. Nearly all large corporations doing business in this City and State are incorporated under the laws of New Jersey or some other State, where more liberal laws prevail and in

tions might be formed in New Jersey to do all their business elsewhere,[44] the state made its policy unmistakably clear. Of the seven largest trusts existing in 1904, with an aggregate capitalization of over two and a half billion dollars, all were organized under New Jersey law; and three of these were formed in 1899.[45] During the first seven months of that year, 1336 corporations were organized under the laws of New Jersey, with an aggregate authorized capital of over two billion dollars.[46] The Comptroller of New York, in his annual report for 1899, complained that " our tax list reflects little of the great wave of organization that has swept over the country during the past year and to which this state contributed more capital than any other state in the Union." " It is time," he declared, " that great corporations having their actual headquarters in this State and a nominal office elsewhere, doing nearly all of their business within our borders, should be brought within the jurisdiction of this State not only as to matters of taxation but in respect to other and equally important affairs." [47] In 1901 the New York corporation law was again revised.[48]

which inducements are thereby held out to attract capital thither and make it their legal home."

[44] N. J. Laws 1892, p. 90. In 1894, New Jersey provided by statute that corporations of another state should be subjected to the same taxes, license and other requirements in New Jersey as are imposed on New Jersey corporations by such other state. Laws 1894, c. 228, § 3. The statute was " in retaliation for the hostile legislation of some of the other States regarding foreign corporations." J. B. Dill, The General Incorporation Act of New Jersey (1898), p. 100.

[45] See Moody, The Truth About the Trusts, p. 453. Of the 298 corporations listed as " lesser industrial trusts," 150 had New Jersey charters. Id., pp. 454–467.

[46] Edward K. Keasbey, " New Jersey and the Great Corporations," Address before the American Bar Association, August 28, 1899, reprinted in 13 Harvard L. Rev., p. 198.

[47] Report of Comptroller of New York, 1890, p. xxvii.

[48] N. Y. Laws 1901, cc. 355, 520.

The history in other states was similar. Thus, the Massachusetts revision of 1903 was precipitated by the fact that "the possibilities of incorporation in other states have become well known, and have been availed of to the detriment of this Commonwealth." [49]

*Third.* Able, discerning scholars [50] have pictured for us the economic and social results of thus removing all limitations upon the size and activities of business corporations

---

[49] Report of Committee on Corporation Laws, Massachusetts (1903), p. 19. The Governor of Michigan, in his Message to the Legislature in 1921, said of the corporation laws of that state: "Because of their inadequacy to meet modern needs and requirements, and the failure to accord domestic corporations the same rights granted to those organized outside of the state, most of our business corporations are being organized in other states, only to return here as foreign corporations." Journal of House of Representatives of Michigan, 1921, pp. 31, 37; reprinted in Messages of the Governors of Michigan (Michigan Historical Commission, 1927), Vol. 4, pp. 775, 784. In 1921 the corporation laws of Michigan were revised, eliminating, among other things, the maximum limitation on capital stock. See note 20, *supra.*

The effect of the policy of West Virginia was described by President Henry M. Russell in an address before the West Virginia Bar Association in 1891. In the six years ending January 1, 1889, he stated, 330 charters were issued by the state to corporations having their principal places of business elsewhere. Of these, 101 were to be in the District of Columbia, and 65 in New York. "The neighboring State of Pennsylvania has adopted very stringent laws for the government of its corporations. . . . So our Pennsylvania friends who have patent rights or gold mines, come to West Virginia. . . . Of our 330 corporations, 80 were to have their principal offices in Pennsylvania. Our other neighbor, the State of Ohio, carries upon its statute book a law imposing a double liability on the stockholders for the debts of the corporation . . . and 30 out of the 330 have their principal offices in Ohio. Thus 284 of the 330 are found in the cities of Washington and New York and the States of Pennsylvania and Ohio. . . . It is unjust to our sister States." 27 American L. Rev., p. 105.

[50] Adolf A. Berle, Jr. and Gardiner C. Means, The Modern Corporation and Private Property (1932). Compare William Z. Ripley, Main Street and Wall Street (1927).

and of vesting in their managers vast powers once exercised by stockholders—results not designed by the States and long unsuspected. They show that size alone gives to giant corporations a social significance not attached ordinarily to smaller units of private enterprise. Through size, corporations, once merely an efficient tool employed by individuals in the conduct of private business, have become an institution—an institution which has brought such concentration of economic power that so-called private corporations are sometimes able to dominate the State. The typical business corporation of the last century, owned by a small group of individuals, managed by their owners, and limited in size by their personal wealth, is being supplanted by huge concerns in which the lives of tens or hundreds of thousands of employees and the property of tens or hundreds of thousands of investors are subjected, through the corporate mechanism, to the control of a few men. Ownership has been separated from control; and this separation has removed many of the checks which formerly operated to curb the misuse of wealth and power. And as ownership of the shares is becoming continually more dispersed, the power which formerly accompanied ownership is becoming increasingly concentrated in the hands of a few. The changes thereby wrought in the lives of the workers, of the owners and of the general public, are so fundamental and far-reaching as to lead these scholars to compare the evolving "corporate system" with the feudal system; and to lead other men of insight and experience to assert that this "master institution of civilised life" is committing it to the rule of a plutocracy.[51]

The data submitted in support of these conclusions indicate that in the United States the process of absorp-

---

[51] Thorstein Veblen, Absentee Ownership and Business Enterprise (1923), p. 86; Walther Rathenau, Die Neue Wirstchaft (1918), pp. 78–81.

tion has already advanced so far that perhaps two-thirds of our industrial wealth has passed from individual possession to the ownership of large corporations whose shares are dealt in on the stock exchange;[52] that 200 non-banking corporations, each with assets in excess of $90,000,000, control directly about one-fourth of all our national wealth, and that their influence extends far beyond the assets under their direct control;[53] that these 200 corporations, while nominally controlled by about 2,000 directors, are actually dominated by a few hundred persons[54]—the negation of industrial democracy. Other writers have shown that, coincident with the growth of these giant corporations, there has occurred a marked concentration of individual wealth;[55] and that the resulting disparity in

[52] Berle and Means, The Modern Corporation and Private Property, Preface, p. vii.

[53] *Id.*, pp. 31–32. Compare H. W. Laidler, Concentration of Control in American Industry (1931).

[54] Berle and Means, p. 46, n. 34. Compare James C. Bonbright and Gardiner C. Means, The Holding Company (1932); Regulation of Stock Ownership in Railroads, H. R. No. 2789, 71st Cong., 3d Sess. (Dr. W. M. W. Splawn); Hearings before Senate Judiciary Committee, 72d Cong., 2d Sess., on S. 5267, February 14, 1933 (John Frey); Stanley Edwin Howard, Business, Incorporated, in Facing the Facts (J. G. Smith, ed., 1932), p. 124 *et seq.*; Lewis Corey, The House of Morgan, pp. 354–356, 441–448; George W. Norris, The Spider Web of Wall Street, Cong. Rec., 72d Cong., 2d Sess., pp. 4917–4928 (February 23, 1933).

[55] Federal Trade Commission, National Wealth and Income (1926); S. Howard Patterson and Karl W. H. Scholz, Economic Problems of Modern Life (1927), c. 22; Lewis Corey, The New Capitalism, in American Labor Dynamics (J. B. S. Hardman, ed., 1928), c. 3; Stuart Chase, Prosperity—Fact or Myth (1929), c. 9; H. Gordon Hayes, Our Economic System (1929), Vol. II, c. 56; Willard E. Atkins et al., Economic Behavior (1931), Vol. II, c. 34; Harold Brayman, Wealth Rises to the Top, in Outlook and Independent, Vol. 158, No. 3 (May 20, 1931), p. 78; Buel W. Patch, Death Taxes and The Concentration of Wealth, in Editorial Research, Reports, Vol. II, 1931, No. 11 (September 18, 1931), pp. 635–637; Frederick C. Mills, Economic Tendencies in the United States (National Bureau of

incomes is a major cause of the existing depression.[56] Such is the Frankenstein monster which States have created by their corporation laws.[57]

---

Economic Research, in Co-operation with the Committee on Recent Economic Changes, 1932), pp. 476–528, 549–558; Paul H. Douglas, Dividends Soar, Wages Drop, in World Tomorrow, December 28, 1932, p. 610; reprinted in Congressional Record, 72nd Cong., 2d Sess., Vol. 76, p. 2291 (January 20, 1933). Compare Morris A. Copeland, The National Income and its Distribution, in Recent Economic Changes in the United States (Report of President's Conference on Unemployment, Committee on Recent Economic Changes, 1929), Vol. II, c. 12; Willford I. King, The National Income and Its Purchasing Power (1930). George L. Knapp pointed out that in 1929, 504 persons had $1,185,135,300 taxable net income, whereas the aggregate gross market value of all the cotton and all the wheat grown in the United States in 1930 by the 2,332,000 cotton and wheat farmers was only $1,191,451,000 (see Labor, March 31, 1931, p. 4; id., May 19, 1931, p. 4; id., November 29, 1932 p. 4); and that the estimate of the aggregate dividends and interest paid in the United States in 1932 was $1,642,000,000, whereas that of factory wages was $903,000,000. See Labor, February 14, 1933, p. 4. (Compare the final figures in Bureau of Internal Revenue, Statistics of Income for 1929, pp. 5, 61, showing that 513 persons had taxable net income of $1,212,098,784.)

[56] Compare J. A. Hobson, Poverty in Plenty (1931), chs. 2, 4; Arthur B. Adams, The Business Depression of 1930, in American Economic Review, Vol. 21 (March, 1931, supplement), p. 183; John A. Ryan, The Industrial Depression of 1929–1931, in Questions of The Day (1931), pp. 209–217; Philip F. LaFollette, Message to the Legislature of Wisconsin, November 24, 1931, pp. 6–8; Fred Henderson, Economic Consequences of Power Production (1931), c. 1; Paul Blanshard, Socialist and Capitalist Planning, in Annals of The American Academy of Political and Social Science, Vol. 162 (July, 1932), pp. 6–8; Arthur Dahlberg, Jobs, Machines, and Capitalism (1932), pp. 205–208; Scott Nearing, Must We Starve? (1932), p. 119; George Soule, The Maintenance of Wages, in Proceedings of The Academy of Political Science, Vol. 14, No. 4 (January, 1932), pp. 87, 91; Christ Christensen, Major Problems of Readjustment, in id., Vol. 15, No. 2 (January, 1933), p. 235; Taylor Society Bulletin, Vol. 17, No. 5 (October, 1932), pp. 165–193.

[57] Compare I. Maurice Wormser, Frankenstein, Incorporated (1931)

*Fourth.* Among these 200 corporations, each with assets in excess of $90,000,000, are five of the plaintiffs. These five have in the aggregate, $820,000,000 of assets;[58] and they operate, in the several States, an aggregate of 19,718 stores.[59] A single one of these giants operates nearly 16,000.[60] Against these plaintiffs, and other owners of multiple stores, the individual retailers of Florida are engaged in a struggle to preserve their independence—perhaps a struggle for existence. The citizens of the State, considering themselves vitally interested in this seemingly unequal struggle, have undertaken to aid the individual retailers by subjecting the owners of multiple stores to the handicap of higher license fees. They may have done so merely in order to preserve competition. But their purpose may have been a broader and deeper one. They may have believed that the chain store, by furthering the concentration of wealth and of power and by promoting absentee ownership, is thwarting American ideals; that it is making impossible equality of opportunity; that it is converting independent tradesmen into clerks; and that

[58] See Berle and Means, The Modern Corporation and Private Property, p. 21: This figure includes the assets of Drug, Inc., which in 1928 acquired the stock of United Drug Co., which in turn controls through stock ownership the Louis K. Liggett Co. See Moody's Industrial Securities (1932), pp. 1215, 1217, 1219.

[59] The total is compiled from figures, as of December 31, 1930, in Report of Federal Trade Commission on Growth and Development of Chain Stores, Sen. Doc. No. 100, 72d Cong., 1st Sess. (1932), pp. 76–77. Compare English Co-operative Wholesale Society, Limited, [U. S.] Commerce Reports, February 18, 1933, p. 104.

[60] The Report of the Federal Trade Commission, *supra*, note 59, at p. 76, gives 15,738 as the number of stores operated by the Great Atlantic and Pacific Tea Co. The number operated by the other four plaintiffs is as follows: Louis K. Liggett Co., 549; Montgomery Ward & Co., 556; United Cigar Stores Co., 994; F. W. Woolworth Co , 1,881. *Ibid.*

it is sapping the resources, the vigor and the hope of the smaller cities and towns.[61]

The plaintiffs insist that no taxable difference exists between the owner of multiple stores and the owner of an individual store. A short answer to the contention has already been given, so far as required for the decision of this case. It is that the license fee is not merely taxation. The fee is the compensation exacted for the privilege of carrying on intrastate business in corporate form. As this privilege is one which a State may withhold or grant, it may charge such compensation as it pleases. Nothing in the Federal Constitution requires that the compensation demanded for the privilege should be reasonable. Moreover, since the authority to operate many stores, or to operate in two or more counties, is certainly a broader privilege than to operate only one store, or in only one county, there is in this record no basis for a finding that it is unreasonable to make the charge higher for the greater privilege.

A more comprehensive answer should, however, be given. The purpose of the Florida statute is not, like ordinary taxation, merely to raise revenue. Its main purpose is social and economic. The chain store is treated as a thing menacing the public welfare. The aim of the statute, at the lowest, is to preserve the competition of the

---

[61] Compare Montaville Flowers, America Chained (1931); H. E. Fryberger, The Abolition of Poverty (1931); W. H. Cameron, Our Juggernaut (1932); M. M. Zimmerman, The Challenge of Chain Store Distribution (1931), pp. 2–4; Godfrey M. Lebhar, The Chain Store—Boon or Bane? (1932), p. 59; James L. Palmer, Are These Twelve Charges Against the Chains True? in Retail Ledger, July, 1929, reprinted in E. C. Buehler, Debate Handbook on the Chain Store Question (1930), p. 102; Edward G. Ernst and Emil M. Hartl, The Chain Store and the Community, in Nation, November 19, 1930, p. 545; John P. Nichols, Chain Store Manual (1932), c. 5.

independent stores with the chain stores; at the highest, its aim is to eliminate altogether the corporate chain stores from retail distribution. The legislation reminds of that by which Florida and other States, in order to eliminate the " premium system " in merchandising, exacted high license fees of merchants who offered trading stamps with their goods. *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Tanner* v. *Little,* 240 U. S. 369. Compare *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157; *Singer Sewing Machine Co.* v. *Brickell,* 233 U. S. 304.

The plaintiffs discuss the broad question whether the power to tax may be used for the purpose of curbing, or of exterminating, the chain stores by whomsoever owned. It is settled that a State " may carry out a policy " by " adjusting its revenue laws and taxing system in such a way as to favor certain industries or forms of industry." *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 62; *Citizens Telephone Co.* v. *Fuller,* 229 U. S. 322, 329.[62] And since the Fourteenth Amendment " was not intended to compel the State to adopt an iron rule of equal taxation," *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237, it may exempt from taxation kinds of business which it wishes to promote; *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114; and may burden more heavily kinds of business which it wishes to discourage. *Williams* v. *Fears,* 179 U. S. 271; *Armour Packing Co.* v. *Lacy,* 200 U. S. 226; *Brown-Forman Co.* v. *Kentucky,* 217 U. S. 563; compare *Alaska Fish Co.* v. *Smith,* 255 U. S. 44. To do that has been the practice also of the Federal Government. It protects, by customs duties, our manufacturers and producers from the competition of foreigners. Compare *Hampton & Co.*

---

[62] Indeed, it has been urged that the taxation of the States and the Nation should be framed not with a view solely to the raising of revenue, but always for the purpose of promoting that social policy which the people deem wise.

v. *United States,* 276 U. S. 394, 411–413; also, *Billings* v. *United States,* 232 U. S. 261. It protects, by the oleo-margarine laws, our farmers and dairymen from the competition of other Americans. Compare *McCray* v. *United States,* 195 U. S. 27. It eliminated, by a prohibitive tax, the issue of state bank notes in competition with those of national banks. Compare *Veazie Bank* v. *Fenno,* 8 Wall. 533. Such is the constitutional power of Congress and of the state legislatures. The wisdom of its exercise is not the concern of this Court.

Whether chain stores owned by individuals may be subjected to the discrimination here challenged need not, however, be decided. This case requires decision only of the narrower question—whether the State may freely apply discrimination in license fees against corporate chain stores. The essential difference between corporations and natural persons has been recognized by the Federal Government in taxing the income of businesses when conducted by corporations, while exempting a similar business when carried on by an individual or partnership: *Flint* v. *Stone-Tracy Co.,* 220 U. S. 107, 158. It has, at other times, imposed upon businesses conducted by corporations heavier taxes than upon those conducted by individuals.[63] The equality clause of the Fourteenth Amendment presents no obstacle to a State, likewise, taxing businesses engaged in intrastate commerce differently according to the instruments by which they are carried on; provided the purpose of the discrimination is a permissible one, the discrimination employed a means appropriate to achieving the end sought, and the difference in the instruments so employed vital. Compare *Fort Smith Lumber Co.* v. *Arkansas,* 251 U. S. 532. *Quong Wing* v. *Kirkendall,* 223 U. S. 59; *Amoskeag Savings Bank* v. *Purdy,* 231 U. S. 373; *Singer Sewing Machine Co.* v.

[63] See the statutes cited in *Quaker City Cab Co.* v. *Pennsylvania,* 277 U. S. 389, 407–409, notes 5 and 6.

*Brickell,* 233 U. S. 304. The corporate mechanism is obviously a vital element in the conduct of business. The encouragement or discouragement of competition is an end for which the power of taxation may be exerted. And discrimination in the rate of taxation is an effective means to that end.

The requirement of the equality clause that classification " must rest upon some ground of difference having a fair and substantial relation to the object of the legislation," *Louisville Gas & Electric Co. v. Coleman,* 277 U. S. 32, 37, is here satisfied. Mere difference in degree has been widely applied as a difference justifying different taxation or regulation.[64] The difference in power between corporations and natural persons is ample basis for placing them in different classes. Even as between natural persons, where the equality clause applies rigidly, differences in size furnish an adequate basis for discrimination in a tax rate. The size of estates, or of bequests, is the difference on which rest all the progressive inheritance taxes of the States and of the Nation. *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 293; *Knowlton* v. *Moore,* 178 U. S. 41, 109; *Keeney* v. *New York,* 222 U. S. 525, 536; *Maxwell* v. *Bugbee,* 250 U. S. 525; *Salomon* v. *State Tax Commission,* 278 U. S. 484. Differences in the size of incomes is the basis on which rest all progressive income taxes. *Brushaber* v. *Union Pacific R. Co.,* 240 U. S. 1, 25. Differences in the size of businesses present, likewise, an adequate basis for different rates of taxation. Compare *Citizens Telephone Co.* v. *Fuller,* 229 U. S. 322, 331; *Pacific American Fisheries Co.* v. *Alaska,* 269 U. S. 269. And so do differences in the extent or field of operation.

The State might justify progressively higher license fees for corporations of larger size, or a more extended

---

[64] See *Louisville Gas & Electric Co.* v. *Coleman,* 277 U. S. 32, 42–46, notes 1–6.

field of operation, on the oft-asserted ground that such concerns are more efficient than smaller units and, hence, that they can, and should, contribute more to the public revenues. But the State need not rest the difference in tax rates on a ground so debatable as the assertion that efficiency increases with size.[65] The Federal Constitution does not require that taxes (as distinguished from assessments for betterments) be proportionate to the differences in benefits received by the taxpayers, compare *Illinois Central R. Co.* v. *Decatur*, 147 U. S. 190, 197; *Union Transit Co.* v. *Kentucky*, 199 U. S. 194, 203; *Southern Pacific Co.* v. *Kentucky*, 222 U. S. 63, 76; *St. Louis & Southwestern Ry.* v. *Nattin*, 277 U. S. 157, 159; or that taxes be proportionate to the taxpayer's ability to bear the burden.

---

[65] Compare Hearings before Senate Committee on Interstate Commerce, pursuant to S. Res. 98, Sen. Doc. 62d Cong., 2d Sess., Vol. 1, p. 1147 *et seq.* (1912); Report of Federal Trade Commission on The Meat Packing Industry (1919), Pt. III, p. 118 *et seq.;* A. M. Kales, Contracts and Combinations in Restraint of Trade (1918), §§ 74–90; F. A. Fetter, Big Business and the Nation, in Facing the Facts (J. G. Smith, ed., 1932), pp. 186–213; F. A. Fetter, The Masquerade of Monopoly (1931), pp. 367–380; Myron W. Watkins, Large-Scale Production, in Encyclopaedia of The Social Sciences, vol. 9, p. 170; A. S. Dewing, A Statistical Test of the Success of Consolidations, Quarterly Journal of Economics, vol. 36, p. 84; Virgil Jordan, The Flight from the Centre, in Scribner's, Vol. 91, p. 262 (May, 1932); W. L. Thorp, The Changing Structure of Industry, in Recent Economic Changes (1929), pp. 167, 179–206; Glenn Frank, Big Men and Big Enterprise, Albany Evening News, December 7, 1931; December 18, 1931; Glenn Frank, Thunder and Dawn (1932), pp. 106–110; Julius Klein, Assistant Secretary of Commerce, United States Daily, April 11, 1932, p. 1; Frederick M. Feiker, Director, Bureau of Foreign and Domestic Commerce, U. S. Daily, February 27, 1932, p. 3; Carter D. Poland, Small Business Has Its Day, Nation's Business, March, 1933, p. 51; also, Camera dei Deputati, N. 1209–A, Relazione della Giunta Generale del Bilancio (April 29, 1932), pp. 45–47.

Since business must yield to the paramount interests of the community in times of peace as well as in times of war, a State may prohibit a business found to be noxious and, likewise, may prohibit incidents or excrescences of a business otherwise beneficent. *Mugler* v. *Kansas,* 123 U. S. 623; *Ozan Lumber Co.* v. *Union County Bank,* 207 U. S. 251; *Williams* v. *Arkansas,* 217 U. S. 79; *Engel* v. *O'Malley,* 219 U. S. 128; *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157. Businesses may become as harmful to the community by excessive size, as by monopoly or the commonly recognized restraints of trade. If the State should conclude that bigness in retail merchandising as manifested in corporate chain stores menaces the public welfare, it might prohibit the excessive size or extent of that business as it prohibits excessive size or weight in motor trucks or excessive height in the buildings of a city. Compare *Morris* v. *Duby,* 274 U. S. 135; *Welch* v. *Swasey,* 214 U. S. 91; *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 388. It was said in *United States* v. *U. S. Steel Corp.,* 251 U. S. 417, 451, that the Sherman Anti-Trust Act did not forbid large aggregations; but the power of Congress to prohibit corporations of a size deemed excessive from engaging in interstate commerce was not questioned.

The elimination of chain stores, deemed harmful or menacing because of their bigness, may be achieved by levelling the prohibition against the corporate mechanism—the instrument by means of which excessive size is commonly made possible. Or, instead of absolutely prohibiting the corporate chain store, the State might conclude that it should first try the more temperate remedy of curbing the chain by imposing the handicap of discriminatory license fees. Compare *St. Louis Poster Advertising Co.* v. *St. Louis,* 249 U. S. 269, 274; *Hammond Packing Co.* v. *Montana,* 233 U. S. 331, 333–334; *Bradley* v. *Richmond,* 227 U. S. 477, 480. "Taxation is regulation just as prohibition is." *Compañía General de Ta-*

*bacos* v. *Collector*, 275 U. S. 87, 96. And the State's power to make social and economic experiments is a broad one.

*Fifth.* The mere fact that the taxpayer is a corporation does not, of course, exclude it from the protection afforded by the equality clause. Corporations and individuals, aliens and citizens, are for most purposes in the same class. Ordinarily, they have the same civil rights; are entitled to the same remedies; are subject to the same police regulations; and are also subject to the same tax laws. Where such is the case, the corporation taxpayer is entitled, like the individual, to the protection of the equality clause against discrimination, however effected. Compare *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239. But the chief aim of the Florida statute is apparently to handicap corporate chain stores—that is, to place them at a disadvantage, to make their success less probable. No other justification of the discrimination in license fees need be shown; since the very purpose of the legislation is to create inequality and thereby to discourage the establishment, or the maintenance, of corporate chain stores; since that purpose is one for which the power of taxation may be exerted; since higher license fees is an appropriate means of discouragement; and corporations have not the inherent right to engage in intrastate commerce. The clear distinction between the equality clause and the due process clause of the Fourteenth Amendment should not be overlooked in this connection. The mandate of the due process clause is absolute. That clause is of universal application. It knows not classes. It applies alike to corporations and to individuals, to citizens and to aliens, *Home Insurance Co.* v. *Dick,* 281 U. S. 397, 411; *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481, 489. The equality clause, on the other hand, is limited in its operation to members of a class.

It is true that the Florida Anti-Chain Store Law, like others, is not drawn so as to apply only to giant corporate chains. In terms, it applies to the small corporations as well as to the large; and also to natural persons. But the history of such legislation indicates that these laws were aimed at the huge, publicly-financed corporations; and that the statutes were couched in comprehensive terms in the hope of thereby avoiding constitutional doubts raised by judicial statements that the equality clause applies alike to natural persons and corporations. It was said in *Quaker City Cab Co. v. Pennsylvania*, 277 U. S. 389, 402, that the equality clause precludes making the character of the owner 'the sole fact on which a discrimination in taxation shall depend. And in *Frost v. Corporation Commission*, 278 U. S. 515, 522, it was said (citing the *Quaker City Cab* case; *Kentucky Finance Corp. v. Paramount Exchange*, 262 U. S. 544, 550; *Gulf, Colorado & Santa Fe Ry. v. Ellis*, 165 U. S. 150, 154) " that a corporation is as much entitled to the equal protection of the laws as an individual." These statements require, in my opinion, this qualification. Whenever the discrimination is for a permitted purpose—as when a State, having concluded that activity by corporations should be curbed, seeks to favor businesses conducted by individuals—the corporate character of the owner presents a difference in ownership which may be made the sole basis of classification in taxation, as in regulation.[66] The discrimination cannot, in such a case,

---

[66] Compare Ernst Freund, Standards of American Legislation (1917), pp. 40–41: " So far as the businesses of banking and insurance have been carried on under corporate charters they have been the subject of thorough and detailed regulation, while private banking and the unincorporated forms of fraternal insurance remain to this day in the main unregulated and uncontrolled. Railroads have been built and operated from the beginning by corporate enterprise; thus legislation was called for and was made the instrument of exercising

be held arbitrary, since it is made in order to effect the permitted hostile purpose and is appropriate to that end. Compare *Lawrence* v. *State Tax Commission,* 286 U. S. 276, 283–285; *New York ex rel. N. Y. & Albany Lighterage Co.* v. *Lynch, post,* p. 590.

*Sixth.* The plaintiffs contend, for a further reason, that there is no taxable difference justifying the discrimination in license fees. They assert that the struggle between them and the independently owned stores is, in fact, not an unequal one; and in support of this assertion, they call attention to those paragraphs in the bill which describe the coöperative chains of individual stores and their rapid growth. These paragraphs allege that by " affiliations and coöperative organizations single grocery [and other] store owners have adopted the best features of chain store merchandising and have secured substantially all the benefits derived therefrom, while at the same time they have avoided burdens of capital investment, insurance, etc., incident to the carrying of a large stock in a central warehouse." The bill sets forth how this has been achieved, describing in detail the recent advances in efficiency of such coöperative merchandising. It alleges, moreover, that the members of a coöperative chain have the superior advantage of the good will and personal interest of the individual owners, as compared with the hired managers of the regular chains; and that all these facts were known to the Legislature when it enacted the statute here challenged.

---

public power over operation, service and in some cases over rates; the express business, on the other hand, which happened to be carried on chiefly by unincorporated concerns, or at least did not seek special charters, practically escaped regulation and was not placed under administrative jurisdiction until the Rate Act of 1906; this tends to show that it was not merely the fact of being a common carrier subject to special power, but more particularly the fact of being a corporation asking for powers, which subjected the railroad company to the extensive and intensive legislative régime which it has experienced."

These allegations are admitted by the motion to dismiss; and they are supported by recent experience of which we may take notice.[67] But it does not follow that because the independently owned stores are overcoming through cooperation the advantages once possessed by chain stores, there is no taxable difference between the corporate chain and the single store. The State's power to apply discriminatory taxation as a means of preventing domination of intrastate commerce by capitalistic corporations is not conditioned upon the existence of economic need. It flows from the broader right of Americans to preserve, and to establish from time to time, such institutions, social and economic, as seem to them desirable; and, likewise, to end those which they deem undesirable.

---

[67] Federal Trade Commission, Report on Coöperative Grocery Chains, Sen. Doc. No. 12, 72nd Cong., 1st Sess.; Report on Coöperative Drug and Hardware Chains, Sen. Doc. No. 82, 72nd Cong., 1st Sess. See, also, A. E. Haase and V. H. Pelz, The Voluntary Chain, in Printer's Ink Monthly, February 1929, p. 29, id., March 1929, p. 31, id., April 1929, p. 52, id., May 1929, p. 52; Paul H. Nystrom, Chain Stores (U. S. Chamber of Commerce, 1930), pp. 17, 21; Nystrom, Economics of Retailing (3rd ed., 1932), c. 13; Craig Davidson, Voluntary Chain Stores (1930); Marvin M. Black, Jr., Troubled Waters of Distribution, Outlook and Independent, May 15, 1929, p. 90; The Voluntary Chains (American Institute of Food Distribution, Inc., 1930); M. E. Bridston, Voluntary Chain Flourishes in Difficult Field, in Chain Store Review, April 1929, p. 12; "The Challenge of the Chains" Accepted by 500 Pacific Coast Grocers, Magazine of Business, July, 1928, p. 28. Compare Federal Trade Commission, Report on Coöperation in Foreign Countries, Sen. Doc. No. 171, 68th Cong., 2d Sess.; Huston Thompson, The Coöperative Movement in Foreign Countries, Congressional Digest, October 1925, p. 256; C. R. Fay, Co-operation at Home and Abroad (rev. ed. 1925); A. H. Enfield, Co-operation (1927); J. P. Warbasse, Co-operative Democracy (1923); Cedric Long, Consumers Co-operation, in A New Economic Order (Kirby Page, ed., 1930), p. 213; Charles R. Tuttle, The New Co-operative Order (1918); Charles T. Sprading, Mutual Service and Co-operation (1930), pp. 44–127; Henry Clay, Co-operation and Private Enterprise (1928).

The State might, if conditions warranted, subject giant corporations to a control similar to that now exerted over public utility companies.[68]   Or, the citizens of Florida might conceivably escape from the domination of giant corporations by having the State engage in business. Compare *Jones* v. *Portland,* 245 U. S. 217; *Green* v. *Frazier,* 253 U. S. 233; *Standard Oil Co.* v. *Lincoln,* 275 U. S. 504.   But Americans seeking escape from corporate domination have open to them under the Constitution another form of social and economic control—one more in keeping with our traditions and aspirations.   They may prefer the way of coöperation, which leads directly to the freedom and the equality of opportunity which the Fourteenth Amendment aims to secure.[69]   That way is clearly open.   For the fundamental difference between capitalistic enterprise and the coöperative—between economic absolutism and industrial democracy—is one which has been commonly accepted by legislatures and the courts as justifying discrimination in both regulation and taxation.[70]   *Liberty Warehouse Co.* v. *Burley Tobacco Growers Assn.,* 276 U. S. 71.   Compare *Citizens Telephone Co.* v. *Fuller,* 229 U. S. 322.

---

[68] The general apprehension of corporations with huge capital was not allayed until after the introduction of two governmental devices designed to protect the rights and opportunities of the individual. Commissions to regulate public utilities—to curb the exaction of sanctioned monopolies.   Anti-trust laws—to prevent monopolies in industry and commerce.   When the Act to Regulate Commerce was passed in 1887, there were commissions in 25 States.   Vanderblue and Burgess, Railroads (1923), p. 15.   See M. H. Hunter, The Early Regulation of Public Service Corporations, 7 American Economic Review, p. 569, reprinted in Dorau, Materials for the Study of Public Utility Economics (1930), pp. 283–294.

[69] Compare Harold J. Laski, The Recovery of Citizenship (1928); Horace M. Kallen, Individualism (1933), pp. 235–241.

[70] See *Frost* v. *Corporation Commission,* 278 U. S. 515, 539, notes 8–16, 23.

There is a widespread belief that the existing unemployment is the result, in large part, of the gross inequality in the distribution of wealth and income which giant corporations have fostered; that by the control which the few have exerted through giant corporations, individual initiative and effort are being paralyzed, creative power impaired and human happiness lessened; that the true prosperity of our past came not from big business, but through the courage, the energy and the resourcefulness of small men; that only by releasing from corporate control the faculties of the unknown many, only by reopening to them the opportunities for leadership, can confidence in our future be restored and the existing misery be overcome; and that only through participation by the many in the responsibilities and determinations of business, can Americans secure the moral and intellectual development which is essential to the maintenance of liberty. If the citizens of Florida share that belief, I know of nothing in the Federal Constitution which precludes the State from endeavoring to give it effect and prevent domination in intrastate commerce by subjecting corporate chains to discriminatory license fees. To that extent, the citizens of each State are still masters of their destiny.

MR. JUSTICE CARDOZO, dissenting in part.

The graduation of a tax upon the business of a chain store may be regulated by the test of territorial expansion, and territorial expansion may be determined by the spread of business from one county into another.

Students of the chains have accepted the classification of the Census Bureau, which divides them into three groups: local, sectional and national. Census of 1930, Report on Retail Distribution by Chains; Lebhar, " The Chain Store," p. 20. Chains are local " if substantially all their stores are located in and around some one city."

In 1930, the number of these was 5589. They are sectional if their "stores are located in some one section of the country, such as the New England states or the Pacific Coast states or in the Gulf Southwest or any other geographic division." Of these there were 1136. They are national if their "interests are broader than those of any one section of the country." Of these there were 321.

Statistics thus indicate that there is a definite line of cleavage between chains that serve consumers within a single territorial unit and those framed for larger ends. The business that keeps at home affects the social organism in ways that differ widely from those typical of a business that goes out into the world. It affects the social organism, but also it affects itself. With the lengthening of the chain there are new fields to be exploited. The door is opened to opportunities that have hitherto been closed. Where does the local have an end and the non-local a beginning? The legislature had to draw the line somewhere, and it drew it with the county. Within the range of reasonable discretion its judgment must prevail. There is need to remember the varying significance of county lines for varying communities. From the beginnings of our history, the town has been the distinctive unit of government in the New England states and in many others of the North. In the South from the beginning the distinctive unit has been the county. Bryce, The American Commonwealth, (2nd edition, revised) vol. 1, part II, chap. 48, pp. 570, 571; K. H. Porter, County and Township Government in the United States, p. 60. Florida is largely an agricultural state. The census of 1930 shows three cities of over 100,000 (Jacksonville, 129,549, Miami, 110,637, and Tampa, 101,161); four between 20,000 and 40,000 (Orlando, West Palm Beach, Pensacola, and St. Petersburg); and seven between 10,000 and 20,000. Of these fourteen cities, all are in different counties. In a state with a population thus distributed,

the boundaries of the county will have an approximate correspondence with the area of local business. When a chain goes beyond the county, beyond the traditional boundaries of local government, it puts the locality behind it, and elects to play for larger stakes.

Every new community is potentially a new centre of economic opportunity. There is then a hazard of new adventures, a tapping of new sources of dominance and profit. At once with this advance, the tax mounts into higher brackets, but does not mount again. There are not progressive increases when a business, after moving into one county, moves on again to others. The second county once attained, the rate is not affected though many more are added. The chain has made its choice, and for this it pays but once. It has put its local character away, and found alignment in another class. It is on the way to becoming an organization of another order, to becoming sectional or national. There is confirmation of this tendency in the facts stated in the bill as to the stores operated by the complainants and by those allowed to intervene. All who have gone beyond a single county do business in many more, or else in many states. One can imagine extreme cases, to be sure, where county lines may be crossed and the business remain local in substance, if not in form. The store in the new county may be next to the boundary line that separates from the old. So too the chain that is national in scope may have its Florida stores in one county and one only, in which event it is local *quoad* its activities in Florida, whatever it may be beyond. Lawmakers are not required to legislate with an eye to exceptional conditions. Their search is for probabilities and tendencies of general validity, and these being ascertained, they may frame their rule accordingly. They are not required to legislate with an eye to forms of growth beyond the limits of their own state. In laying a tax upon a Florida chain their concern is with those

activities that have social and economic consequences for Florida and her people. The question for them, and so for us, is not how a business might be expected to develop if its forms and lines of growth were to be predicted in the abstract without reference to experience. The question is how it *does* develop in normal or average conditions, and the answer to that question is to be found in life and history. When the problem is thus approached, the movement from one county to another becomes in a very definite sense the crossing of a frontier, a change as marked as the difference between wholesale trade and retail. *Cook* v. *Marshall County,* 196 U. S. 261. So at least the legislature might not unreasonably believe, and act on that belief in the formulation of the law. *O'Gorman & Young* v. *Hartford Fire Insurance Co.,* 282 U. S. 251, 257.

Corresponding to the change of opportunity—to the change at the periphery—that accompanies the expansion of the area of action are changes at the centre. The chain that is merely local is likely to be organized more simply than the one that spreads itself afar. Methods at the point of origin must be adapted to expanding needs. Other things being equal, there will be a new concentration of control, a new unity of administration, a new emphasis of the very features that distinguish chain stores from others and supply an important reason for taxing the two differently, whether within the county or without. *Tax Commissioners* v. *Jackson,* 283 U. S. 527, 534. Movement from the locality to other fields of activity is thus a symptom of an inner change. This, at least, is its normal meaning, its meaning, or so the legislature might fairly say, in the common run of cases. If so, the scale of payment may be graduated in correspondence with the changing facts.

There is a distinction not to be ignored between the facts that determine subjection to a tax and those that measure its amount. " Classification good for one pur-

pose may be bad for another.". *Louisville Gas Co. v. Coleman,* 277 U. S. 32, 38. The case cited drew a distinction between graduation of the burden and unconditional exemption. The business conducted by these appellants is not subjected to a tax *because* it is in several counties. It is taxed because it is the business of operating chain stores, and its spread over counties is only one circumstance, along with others, to be considered by the Collector in determining how much it has to pay. The factor may be inconclusive if our search is for mathematical exactness. This is far from saying that it is to be rejected as irrelevant. None of the factors measuring this tax will answer to a test of certainty. Even where the business is kept within a single county, there is no certainty that a chain of thirty stores will so differ from one of fifty either in its method of organization or in the proportionate returns that the first should pay a tax at one rate for every store, and the second at another. The like is true where organization is affected by territorial expansion. There is a relation surpassing mere irrelevance between the essential character of the business and its territorial spread beyond the unit of its origin. Even if this is doubtful *a priori,* it is made apparent or probable by statistics and experience. A court will go no farther.

What has been written has discovered differences between local chains and others, differences in organization at the centre and in opportunity at the outer rim. The differences need not be great. *Tax Commissioners* v. *Jackson, supra,* at p. 538. This is true even of the classes that may be described as primary, those accompanied by a division between a tax and no tax. It is true even more plainly of subclasses, the secondary divisions corresponding to graduations of the scale. How slight may be the variance that will mark a permissible classification between a tax and none at all has illustration in the case at hand. The prevailing opinion upholds the power of the state to discriminate between integrated and volun-

tary chains, though the difference of organization is slender and the inequality of economic benefit uncertain and disputed. Slender though the difference of organization is, it is real enough to rescue classification from the reproach of an arbitrary preference. It will not do to shut one's eyes to the motive that has led so many legislatures to lay hold of this difference and turn it into a basis for a new system of taxation. The system has had its origin in the belief that the social utility or inutility of one group is less or greater than that of others, and that the choice of subjects to be taxed should be adjusted to social gains and losses. Courts would be lacking in candor if they were not to concede the presence of such a motive behind this chain store legislation. But a purpose to bear more heavily on one class than another will not avail without more to condemn a tax as void. *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 95; *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114, 126; *Sproles* v. *Binford,* 286 U. S. 374, 394; *Stephenson* v. *Binford,* 287 U. S. 251. We must know why the discrimination is desired, to what end it is directed and the relation between end and means. If the motive is vindictiveness, ensuing in mere oppression, the result may be one thing. If the motive and the end attained are the advancement of the public good, the result may be quite another, unless preference and repression go so far as to outrun the bounds of reason. The legislature has determined with the approval of the court that an integrated chain is a taxable class separable from independent dealers and even from chains that are merely coöperative leagues. If these differences suffice to establish a basis for distinction between a tax and none at all, smaller differences may suffice for the graduation of the scale. The legislature has found them in those variations of degree that separate a chain within the territorial unit of the locality from chains that are reaching out for wider fields of power. There is no need to approve or disapprove the concept of utility or inutility reflected in such laws. *State Board of Tax Commissioners* v. *Jackson,*

*supra,* at p. 537. The concept may be right or wrong. At least it corresponds to an intelligible belief, and one widely prevalent today among honest men and women. Cf. *Otis* v. *Parker,* 187 U. S. 606. With that our function ends.

Systems of taxation are not framed, nor is it possible to frame them, with perfect distribution of benefit and burden. Their authors must be satisfied with a rough and ready form of justice. This is true in special measure while the workings of a novel method are untested by a rich experience. There must be advance by trial and error. Taxes upon chain stores are not exempt from these infirmities. To what extent there is a change of form and spirit when a business ceases to be local is not a question of law. *O'Gorman & Young* v. *Hartford Fire Ins. Co., supra.* In essence it is one of fact. There is a presumption that the legislature did not classify along the lines of counties without study of the relevant data or without an informed and considered judgment. Its findings are not subject to annulment by a court unless facts within the range of judicial notice point to them as wrong. In discarding as arbitrary symbols the lines that it has chosen, there is danger of forgetting that in social and economic life the grooves of thought and action are not always those of logic, and that symbols may mean as much as conduct has put into them.

Holding these views, I find it unnecessary to consider whether the statute may be upheld for the additional reasons that have been stated by Mr. Justice Brandeis with such a wealth of learning. They present considerations that were not laid before us by counsel either in the briefs or in the oral argument, and a determination of their validity and weight may be reserved with propriety until the necessity emerges.

My vote is for affirmance.

I am authorized to state that Mr. Justice Stone concurs in this opinion.