### FLORIDA EAST COAST RAILWAY CO. v. FLORIDA RAILROAD ASSESSMENT BOARD, et al.

No. 17709.

Circuit Court, Leon County.

March 27, 1964.

J. Lewis Hall of Hall, Hartwell & Hall, Tallahassee, for plaintiff.

James W. Kynes, Attorney General, Joseph C. Jacobs, First Assistant Attorney General, for defendants.

HUGH M. TAYLOR, Circuit Judge.

*Final decree:* By a second amended complaint the plaintiff seeks judicial relief from an alleged illegal assessment for taxation for the year 1961 of its railroad operating properties. The railroad assessment board placed a value of $50,735,661 upon these properties which plaintiff alleges to have had, on January 1, 1961, a full cash value of $20,609,959.

A supplemental complaint attacks, upon the same grounds, the valuation of these properties for 1962 at $50,730,387 although they are alleged to have had a full cash value of $15,599,481 on January 1, 1962.

In each instance the grounds of attack are—(1) overvaluation, and (2) discrimination against plaintiff as compared to the assessment of other major railroads operating in Florida.

The sufficiency of the complaint has been sustained by the District Court of Appeal, First District.[1]

Plaintiff seeks relief on two entirely different theories and it is necessary to keep in mind the distinction between an assessment invalid because in excess of the true value of the property and an assessment invalid because out of proportion to the assessment of other comparable properties.

It is also appropriate to observe that, in cases of this sort, the judicial inquiry is limited to an ascertainment of the legal validity of the actions of other public officials. Judges are not selected because of their abilities as appraisers of property or their capacity to predict the economic future of business ventures based upon past experience and an evaluation of present conditions. Judges may not, therefore, substitute their judgment for that of taxing officials charged with the responsibility to ascertain the value of property for purposes of taxation.

On the other hand, taxing officials are bound by the law and if they do not proceed in accordance with the essential requirements of law, or if they abuse their discretion and arbitrarily or capriciously fix an excessive value upon the property of one taxpayer or wilfully discriminate against one taxpayer, it is the duty of the courts to afford that taxpayer appropriate relief.

The scope of judicial inquiry in cases of this nature under the Federal constitution[2] and under state law[3] has been clearly defined.

---

[1]Green v. Florida East Coast Railway Co., 141 So.2d 326.

[2]Great Northern Railway Co. v. Weeks, 297 U.S. 135, 56 S. Ct. 426, 80 L.Ed. 532.

[3]L. & N. R. R. Co. v. Amos, 123 So. 745, in which the court said—

"The law contemplates that assessing officers shall make just, fair and impartial valuations of property for assessment purposes. And their valuations, when made in the manner provided by law and with practical regard to existing conditions and circumstances of character, locality, use, and other matters that may affect values, will in general not be disturbed by the courts, unless it appears that by intentional, unjust discrimination, or by systematic, arbitrary action, there results manifest and gross inequality or injustice in fixing values, abstractly or relatively, showing an abuse of authority to determine values for assessment purposes."

Thus oriented, the court will consider first the question of—

### Excessive Valuation[4]

The evidence in support of plaintiff's charge of excessive valuation may be summarized as follows—

By interrogatories directed to the defendants it was established that the railroad assessment board first found a tentative value of the plaintiff's properties for each of the years in question by applying a formula presently discussed and then adjusting the figure thus arrived at by what it terms a "judgment factor."

The formula employed by the board consists of three elements, each of which is accorded equal weight. These elements are as follows—

1. *Cost of reproduction less twenty percent for obsolescence.* The "cost of reproduction" used is the Interstate Commerce Commission annual estimate of the cost of reproduction of each railroad, which includes an allowance for depreciation so as to produce an annual estimate of the value of the railroad in its actual existing condition, based entirely upon current cost of reproduction reduced by the actual physical depreciation which the railroad properties have sustained. For use in the assessment formula, this cost of reproduction has been reduced by twenty percent for the purpose of making allowance for the obsolescence of railroads as a means of transportation and the obsolescence of the property employed by reason of technological advances. The I.C.C. in preparing these estimates has adopted the practice of employing "multipliers" which will be discussed later.

2. *A five-year average of stock and debt of the railroad.* This consists of determining at stated intervals over a five-year period the market value of the outstanding stock, bonds and other fixed obligations of the railroad and averaging such values so as to arrive at a single figure representing the five-year average market value of these securities.

3. *A five-year average of net operating income of the railroad capitalized at six percent.* This method of valuing is self-explanatory.

---

[4]The value placed upon plaintiff's properties by the railroad assessment board is not the value upon which taxes are actually assessed. Pursuant to a formula agreed upon as a result of prior litigation (Case No. 13108, Leon County, Chancery), the actual value determined by the board is distributed among the counties through which plaintiff's lines run and the amount allocated to each county is reduced by the ratio of assessed value to actual value of other property in such county as fixed by the county tax assessor.

The tentative value arrived at by the use of this formula is then subjected to what is called a "judgment factor", which consists of any adjustment deemed proper in light of conditions peculiar to the particular railroad being assessed.

Following this procedure, the assessed value of plaintiff's railroad operating properties for the years under consideration were arrived at by these steps—

### 1961

| | | |
|---|---:|---:|
| I. C. C. cost of reproduction | $145,336,000 | |
| Obsolescence 20% | 29,067,000 | |
| Net | | $116,269,000 |
| Average of Market Value of stocks and debts on January 1 of 1957 through 1961(5) | | 50,662,000 |
| Capitalization of 6% of average net operating income 1956 through 1960 | | 29,167,000 |
| TOTAL | | $196,098,000 |
| Average (Value as per formula) | | 65,366,000 |
| Reduction of Value by Judgment Factor | | 14,630,339 |
| *Assessed Value* | | $ 50,735,661 |

### 1962

| | | |
|---|---:|---:|
| I. C. C. cost of reproduction | $147,104,000 | |
| Obsolescence 20% | 29,421,000 | |
| Net | | $117,683,000 |
| Average Market Value of stocks and debts January 1 of 1958 through 1962(5) | | 42,572,000 |
| Capitalization of 6% of average net operating income 1957 through 1961 | | 17,117,000 |
| TOTAL | | $177,372,000 |
| Average (Value as per formula) | | 59,124,000 |
| Reduction of Value by Judgment Factor | | 8,393,613 |
| *Assessed Value* | | $ 50,730,387 |

Plaintiff then produced three witnesses who testified as experts and expressed the following opinions as to the value of plaintiff's operating properties—

| | Jan. 1, 1961 | Jan. 1, 1962 |
|---|---|---|
| H. Clyde Reeves | $26,650,000 | $23,500,000 |
| Max L. Boydston | 30,577,000 | 23,939,000 |
| Maurice L. Wilhelm | 28,000,000 | 24,500,000 |

---

5From the value of securities there is deducted the value of non-operating properties which are assessed by county tax assessors and do not come under the jurisdiction of the railroad assessment board. The propriety of this deduction is not questioned.

Each of these witnesses testified that he gave *no* consideration to the cost of reproduction as an element of value. Each formed his opinion upon a consideration of only two basic factors—capitalization of earnings and market value of stocks and debts. Each gave somewhat different treatment to these factors, and this accounts for the differences in their conclusions.

The plaintiff offered no evidence of any other method of valuation.[6] The court is, therefore, confronted with a single question which is determinative of this phase of the case—Is it unlawful or an abuse of discretion for taxing authorities to give substantial consideration to the cost of reproduction, reduced by depreciation and obsolescence, in assessing railroad property?

The Supreme Court of the United States,[7] highly respected state courts[8] and the leading legal encyclopedias[9] agree that cost of reproduction is one of the factors proper to be considered in valuing railroads for taxation. The taxing authorities of many states[10] take this factor into account, although they differ in the weight which they feel it should be given.

Mr. Edward F. Koncel, an expert for the defendants, gave strong support to the propriety of considering cost of reproduction as a factor in valuing railroad property for taxation.

The argument against using reproduction costs is based upon the economic obsolescence of railroads—the fact that new rail-

---

[6]There is evidence of the cost and present lack of usefulness of double-track over much of plaintiff's lines and the cost and obsolescence of shops, water stations, etc., but nothing of this nature sufficient to constitute a basis of a valuation of the entire system. This testimony will be evaluated in another aspect of the case.

[7]Great Northern Railway Co. v. Weeks, supra.

[8]Chicago and N. W. Railway Co. v. Department of Revenue, 6 Ill. 2d 278, 128 NE 2d 722, cert. den. 351 U.S. 950, 76 S. Ct. 844, 100 L.Ed. 1474, rehearing denied 352 U.S. 859, 77 S.Ct. 22, 1 L.Ed. 2d 69, and authorities there cited.

[9]See American Jurisprudence vol. 51 page 798, title Taxation section 900, Corpus Juris Secundum vol. 84, pages 835-838, title Taxation, section 426b.

[10]Defendants' exhibit 2, which is uncontradicted, indicates that *some* consideration is given to cost of "reproduction", "book value" or "initial cost" by the railroad assessing authorities of the following states— Alabama, Arkansas, California, Delaware, Georgia, Idaho, Illinois, Indiana, Iowa, Louisiana, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington and Wisconsin.

roads are not being built and the competition of other forms of transportation would render it difficult if not impossible to justify the replacement in toto of a major railroad should the entire system be destroyed. This argument, although not without weight, ignores the very pertinent fact that railroads as public service facilities must continue to operate, and in the course of time all their parts except rights of way and the bare ground of station and shop facilities must be replaced. This is particularly true of rails, ties and rolling stock. Reproduction cost is considered in fixing freights and passenger rates.

The court is of the opinion that it cannot hold that the railroad assessment board either violated the law or abused its discretion in taking into account cost of reproduction in valuing plaintiff's properties.

Once this conclusion is reached, there is no basis in the record upon which the court could find abuse of discretion in according this factor the weight which it did.

It will be observed that in using I.C.C. reproduction costs the assessment board immediately allowed a flat 20% reduction for obsolescence. In addition the use of the "judgment factor" produced a further reduction of plaintiff's assessment of $14,630,399 in 1961 and $8,393,613 in 1962.

This brings us to consideration of another argument advanced by plaintiff. The evidence establishes that during the 1920's it made investments totaling many millions of dollars in double-tracking much of its system. It now says that this double-track is uneconomical to operate under present and reasonably foreseeable conditions and that the inclusion of the cost of this double-track in "cost of reproduction" for purposes of assessment results in a serious injustice to it.

Proper evaluation of this argument requires consideration of the testimony of other witnesses for the plaintiff who gave their opinion as to the extent of this improvident investment and the degree of obsolescence of various parts of plaintiff's system.

As summarized by plaintiff's counsel in their brief the total of these items is $47,172,821.[11]

---

[11]This figure includes some $10,000,00 which is the approximate amount of an increase in estimated cost of reproduction of the F.E.C. system occasioned by a change in the I.C.C. method of establishing the "multipliers" hereafter discussed. It should not be included here, but is retained for the purpose of emphasizing the result of accepting all plaintiff's contentions except the complete elimination of cost of reproduction as a factor in assessing.

It is interesting to observe the results of using these figures of plaintiff's witnesses in lieu of the flat 20% deduction for obsolescence and the deduction resulting from defendant's application of the "judgment factor". When this is done the value of the railroad is computed as follows—

### 1961

| | | |
|---|---|---|
| I. C. C. cost of reproduction | $145,336,000 | |
| Less actual obsolescence | 47,173,000 (12) | |
| Net | $ 98,163,000 | $ 98,163,000 |
| Five-year average Stock and debt(5) | | 50,663,000 |
| Five-year average Capitalization of income at 6% | | 29,167,000 |
| Total of elements | | $177,992,000 |
| Value per formula | | 59,331,000 |
| Assessment | | 50,736,000 |
| Excess of value over assessments | | $ 8,595,000 |

### 1962

| | | |
|---|---|---|
| I. C. C. cost of reproduction | $147,104,000 | |
| Less actual obsolescence | 47,171,000 | |
| Net | $ 99,933,000 | $ 99,933,000 |
| Five-year average Stocks and debts(5) | | 46,534,000 |
| Five-year average Capitalization of income at 6% | | 17,117,000 |
| Total of elements | | $163,584,000 |
| Value per formula | | $ 54,528,000 |
| Assessments | | 50,736,000 |
| Excess of value over assessment | | $ 3,792,000 |

Bearing in mind that the I.C.C. cost of reproduction figures have already taken into account physical depreciation of the properties[13] and the deduction for obsolescence in the foregoing tabulations are from the testimony of plaintiff's own witnesses as to actual obsolescence *for railroad purposes* of the plaintiff's properties, it is obvious that the assessment of plaintiff's properties are not in excess of cash value when a reasonable consideration is given to cost of reproduction.

---

12These figures rounded to nearest thousand.

13For the years in question, the I.C.C. allowances of depreciation were— 1961 — $67,224,000; 1962 — $69,632,000.

Plaintiff next argues that even if it be proper to consider cost of reproduction as an element of value, it has been the subject of a grave injustice in the adoption by the assessment board of the method used by the I.C.C. to establish present cost of reproduction. It is shown that in determining the "cost of reproduction" of railroads, the I.C.C. employs figures which it calls "multipliers" arrived at in this way — The cost, as of the period from 1910 to 1914, of various items in railroad construction is ascertained. As to each such item the cost in any other period is represented as a percentage of the 1910-1914 cost. This percentage is the "multiplier" of that item. For example — If the cost of concrete bridge work in the 1910-1914 period was $10 per cubic yard and in 1962 was $50 per cubic yard, the "multiplier" for concrete bridge work in 1962 would be 500. A composite of all item multipliers constitutes a system multiplier.

Prior to 1959 the I.C.C. developed multipliers on a regional basis. In that year the I.C.C. changed to the practice of developing multipliers on a system basis. The result is that multipliers used in evaluating the plaintiff's properties relate entirely to costs in Florida because plaintiff is an intrastate railroad. On the other hand, such railroads as the Seaboard and Atlantic Coast Line, being interstate roads, are valued by using multipliers developed with regard to costs in several states.

Mr. Howard H. Howland, an expert witness for plaintiff, testified that, due to different conditions in Florida, this change in the method of evaluation increased the I.C.C. estimate of the cost of reproduction of the East Coast Railroad approximately 10%. He also testified that as compared to the Seaboard the *change* in the method of evaluation produced a relative increase in the estimated cost of reproduction of the East Coast of "somewhere around ten million dollars."

Noticeably absent from his testimony and from the entire record is any suggestion that the result of the application of the multipliers developed by the I.C.C. was an *inaccurate* determination of the present cost of reproduction of the plaintiff's railroad. In the absence of such a showing the court cannot say that the change made by the I.C.C. did not accomplish that which should have been its purpose — a more perfect way of ascertaining present cost of reproduction of each railroad.

For this reason the court is of the opinion that the item of $10,000,000 in the plaintiff's computation of obsolescense should not be considered. It is included as a deduction from the I.C.C. cost of reproduction in the last tabulation, above, so as to demonstrate that the assessment is not in excess of the full cash value of plaintiff's properties when consideration is given cost of re-

production even when plaintiff is accorded the benefit of every doubt as to the proper ascertainment of that figure and is allowed every reasonable deduction.

The weight to be given Mr. Howland's testimony on the question of discrimination between railroads will be considered under that heading.

### Discrimination

Plaintiff claims that in comparison with the properties of other major railroads in Florida[14] the valuation of its property for taxation is such as to constitute an illegal discrimination against it. It alleges that while other railroads are assessed at "approximately their full cash value as required by law" the valuation placed on the railroad of plaintiff is "grossly in excess of its full cash value."

The evidence on this issue is very meager and is wholly insufficient to sustain the allegations of discrimination.

The assessments of the Seaboard Air Line Railroad and the Atlantic Coast Line Railroad for the two years in question are —

| SAL | 1961 | 1962 |
|---|---|---|
| Tentative value as per formula | $133,580,000 | $129,528,000 |
| Judgment factor (Reduction) | 42,825,000 | 38,767,000 |
| Assessments | $ 90,755,000 | $ 90,767,000 |
| ACL | | |
| Tentative value as per formula | $ 96,178,000 | $ 98,977,000 |
| Judgment factor (Increase) | 11,337,000 | 8,018,000 |
| Assessments | $107,515,000 | $106,996,000 |

It will be observed that the "judgment factor" was used to reduce the valuation of the Seaboard properties in Florida by approximately forty million dollars and to increase the assessment of the Coast Line by approximately ten million dollars. The record does not disclose the reason why the "judgment factor" was applied in this way. Many things could be suggested as possibly having some bearing on the exercise of its discretion by the assessment board so as to produce this result.

---

[14]The complaint specifically alleges discrimination as compared to the Seaboard Air Line Railroad, The Atlantic Coast Line Railroad and the Louisville and Nashville Railroad. The evidence does not cover the L & N.

The Seaboard and Coast Line are both interstate lines and such things as variations in the percentage of unproductive branches, car loadings, gross receipts, car miles, passenger miles, and seasonal fluctuations of business as between the states in which they operate might well justify broad use of the judgment factor in their assessment.

The Coast Line properties were assessed more than the value produced by application of the preliminary formula adopted by the board. This is certainly not evidence of discrimination against plaintiff, whose properties were assessed much lower than strict application of that formula would require.

The fact that the board employed the "judgment factor" so as to give the Seaboard a greater reduction from the figure produced by application of the formula than was accorded plaintiff is inconclusive. Why this was done is not disclosed. Until the contrary is made to appear, the court must assume that the board performed its duty and acted upon circumstances deemed by it to justify this different treatment of these two roads.[15]

The only other evidence tending in any way to show discrimination is the testimony of Mr. Howland that the application of the different "multipliers" to the East Coast and Seaboard produced a difference of about $10,000,000 in the comparative values of the properties of the two railroads located in Florida. Again there is no attempt to relate these two circumstances to the over-all question of the actual value of the Seaboard properties in this state.

The plaintiff is placed in an unfortunate position by the fact that the individual largely responsible for these assessments is now dead and cannot be interrogated as to the reasons for the relative differences in these assessments. This fact, however, does not justify the court in holding that the two circumstances — (1) that the "judgment factor" was employed to give a larger percentage reduction in the formula value of the Seaboard, and (2)

---

[15]"The law contemplates that a wide discretion be accorded to the tax assessor in the valuation of property for the purposes of taxation. In the absence of a clear and posititve showing of fraud or of an illegal act or of an abuse of discretion rendering an assessment authorized by law so arbitrary and discriminating as to amount to a fraud upon a taxpayer or to a denial of the equal protection of the laws, the courts will not in general control the discretion of the tax assessor in making valuations for taxing purposes. The burdens of taxation cannot be made exactly equal." German-American Lumber Co. et al. v. Barbee, 59 Fla. 493, headnote 1, 52 So. 292.

that the I.C.C. multipliers fixed to be used in evaluating the systems of each railroad are different — are sufficient to justify the conclusion that the over-all value placed upon the two railroads results in an illegal discrimination against plaintiff.

This conclusion makes it unnecessary to explore another question which is suggested by the facts, but which the court does not find it necessary to answer at this time — if taxing officials discriminate in making assessments by assessing the property of *one* of several taxpayers in the same class at a substantially smaller percentage of actual value than the assessment of the property of others in the same class, is the proper remedy a lowering of the assessment of each of those discriminated against or an increase in the assessment of the one favored property owner?[16]

### Is Assessment Arbitrary and Capricious?

In its final brief plaintiff says — "The variations from the admitted formula used by the board demonstrate that the board pays no attention to the formula and its actions are completely arbitrary and capricious."

The figures quoted above show that the "judgment factor" in the formula adopted by the board has been used quite liberally and the variations from the figures produced by the mechanical elements of the formula are so great that they present some reason to argue that the formula itself for all practical purposes has, in fact, been abandoned. But if the court should draw this conclusion it would not lead to a different disposition of this case.

Plaintiff's operating railroad properties were assessed at $50,-735,661 in 1961 and $50,730,387 in 1962. It has alleged that these assessments were in excess of the full cash value of the properties. Outside attacking the board's formula (which, for the purpose of this consideration, we will disregard) the *only evidence of over-all excessive valuation* is from experts who decline to give cost of reproduction *any* weight in determining value.

There is substantial evidence that cost of reproduction is an important element in determining value, and that a reasonable consideration of the cost of reproduction of plaintiff's railroad properties could lead reasonable men to the conclusion that the railroad is actually worth the amount of the assessments.

16See Hackney v. McKenney, 151 So. 524, State v. Lehman, 131 So. 333, Liggett Co. v. Lee, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 ALR 699.

Under these circumstances, the court cannot hold that the action of the railroad assessment board is arbitrary and capricious.[17]

For these reasons, it is considered, ordered, adjudged and decreed that the plaintiff has failed to establish by a preponderance of the evidence that it is entitled to any of the relief prayed for in its second amended complaint and its supplemental complaint attacking respectively the assessments of its railroad operating properties for the calendar years 1961 and 1962, and the second amended complaint and supplemental complaint are dismissed at the cost of the plaintiff.

---

[17]In the case of Seaboard Airline Railroad Co. v. Gay, 74 So.2d 569, the court emphasized that the law authorized the railroad assessment board to assess railroad properties "from the best information they can obtain." This does give the board broad powers in determining the method to be used in arriving at the value of a railroad, and it is the final result that must be looked to when the question of the validity of an assessment is brought into litigation.